**STATE AIRLINES, Inc., v. CIVIL AERO-
NAUTICS BOARD et al.**

**No. 9748.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 8, 1948.

Decided April 6, 1949.

EDGERTON, Circuit Judge, dissenting.

Mr. Frederick W. P. Lorenzen, of New York City, with whom Messrs. Wilmer A. Hill and Philip Schleit, both of Washington, D. C., were on the brief, for petitioner.

Mr. Edward Dumbauld, Special Assistant to the Attorney General with whom Messrs. William D. McFarlane, Special Assistant to the Attorney General, Herbert A. Bergson, Assistant Attorney General, Emory T. Nunneley, Jr., General Counsel, John H. Wanner, Assistant General Counsel, Oliver Carter, Acting Chief, Enforcement and Litigation Section, O. D. Ozment and J. A. Seeley, Attorneys, Civil Aeronautics Board, all of Washington, D. C., were on the brief, for respondent. Mr. Edward J. Hickey, Jr., Special Assistant to the Attorney General also entered appearance for respondent.

Mr. Robert B. Hankins, of Jacksonville, Fla., with whom Mr. Charles H. Murchison, of Jacksonville, Fla., was on brief for intervenor Piedmont Aviation, Inc.

Before EDGERTON, CLARK, and PRETTYMAN, Circuit Judges.

CLARK, Circuit Judge.

The case comes before us on a petition to review certain orders of the respondent Civil Aeronautics Board (hereinafter called the Board or respondent), insofar as those orders grant a certificate of public convenience and necessity to Piedmont Aviation, Inc. (hereinafter called Piedmont or intervenor), and deny the application of State Airlines, Inc. (hereinafter called State or petitioner), for such a certificate. There is now no question as to the finality of the orders under review.[1]

Those orders had their origin in a so-called "area proceeding" before the Board in a case known below as the Southeastern States Case. This area proceeding was a consolidated proceeding involving some 45 applications by 25 airline companies (including State and Piedmont) for authority to provide proposed service in a geographical area which included all or a part of about 14 states in southeastern United States. However, we are here concerned with, and shall in the main refer to, only so much of the area proceeding as concerns State and Piedmont. Although this proceeding also treated with applicants for through or "trunkline" services in southeastern United States, we shall focus our attention on only the local or "feeder" air transportation services sought in that area since both Piedmont and State were applicants for "feeder" services.

The numerous applications which came within the geographical scope of the proceeding were consolidated for hearing and a lengthy hearing was held in Greensboro, North Carolina, before Examiners Newmann and Henderson.[2] This hearing commenced in May and ran through the greater part of June of 1945. Both State and Piedmont actively participated in this hearing and both have continued to so participate throughout the various subsequent stages of the proceeding. On June 4, 1946, the Examiners issued a 159-page report in which it was "recommended that the Board find that the public convenience and necessity require," inter alia, that both Piedmont and State be granted certificates authorizing their providing air transportation service over certain specified routes. The recommendation of the Examiners, generally speaking, suggested that Piedmont be given certain routes it sought running roughly north and south, no point on such routes being west of the main range of the Appalachian Mountains. The Examiners' recommendation as to State, on the other hand, urged the award to State of certain specified routes for which it had applied which ran mostly east and west and which crossed the main Appalachian

---

[1] A prior petition, in our docket No. 9604, to review some of the same orders now under review was filed in this court on July 18, 1947. That prior petition was dismissed as premature by this court on September 3, 1947.

[2] Section 1004(a) of the Civil Aeronautics Act of 1938, 52 Stat. 1021 (1938), as amended, 49 U.S.C.A. § 644(a), authorizes this procedure in the following language: "Any member or examiner of the Board, when duly designated by the Board for such purpose, may hold hearings, sign and issue subpenas, administer oaths, examine witnesses, and receive evidence at any place in the United States designated by the Board. In all cases heard by an examiner or a single member the Board shall hear or receive argument on request of either party."

range thus connecting key points in the Ohio Valley with the so-called Piedmont region of North Carolina.

Numerous exceptions to the recommendations of the Examiners were duly filed by State, by Piedmont, by Public Counsel,[3] and by others. After due notice to all interested parties, a full hearing was held before the Board, beginning August 28, 1946. The Board's first decision in the case came down in the form of an Opinion and an Order, both dated April 4, 1947. This decision, so far as concerns the case now before us, granted a temporary (3 year) certificate to Piedmont authorizing air transportation service by Piedmont to designated points along specified routes. That same decision denied the applications of State in their entirety. Since one of the critical questions in this case requires our close scrutiny of the routes ultimately awarded and of the routes sought respectively by Piedmont and by State, we reproduce below two diagrammatic maps which adequately illustrate the main route proposals of both State and Piedmont as contrasted with the authorizations granted by the Board's decision of April 4, 1947 (see Maps Nos. 1 and 2 infra).

State filed a petition for reconsideration of that decision which was granted in part, the Board having limited reargument by State and Piedmont to the questions of "(1) whether the public interest requires the selection of State or Piedmont, and (2) whether the Board committed legal error by awarding the route to Piedmont." After further argument before the Board on these questions, the Board issued a supplemental opinion, dated December 12, 1947, in which it adhered to its original decision and indicated that Piedmont would be granted the temporary certificate sought. That same day an order was entered granting to Piedmont such a certificate. Thereafter, State filed in this court its second petition for review,[4] and this court (a) denied State's motion for stay of the effectiveness of the orders of the Board being reviewed and (b) granted Piedmont's motion for leave to intervene.

The contentions of the parties to this review, as set forth in their briefs and in oral argument before us, make it clear that our decision depends upon the answers which must be given to the following two questions: (1) was Piedmont, at the time of the Board's decision, an applicant for the routes it was ultimately awarded; and (2) *if not,* can the Board award a certificate to one who was not an applicant for the routes authorized by that certificate?

I. *Was Piedmont an applicant for the routes awarded?*

■ We reproduce immediately below the two diagrammatic maps spoken of above:

[3] Public Counsel was at the time of these proceedings, and still is, an attorney from the staff of the Office of the General Counsel of the Board who is assigned to the case and who has a certain degree of responsibility as to the conduct of the proceedings. For the current Board regulation concerning Public Counsel and his duties, see Economic Regulation 302.2(b) (1), 11 Fed. Reg. 177A-358 (1946), 14 Code Fed. Reg. § 302.2(b) (1) (Supp. 1946).

[4] See footnote 1, supra.

These maps do not purport to show all of the points and routes applied for at any time by State and by Piedmont, nor do they attempt to portray all applications by both parties for all types of proposed service. A careful study of the very

voluminous record (consisting of 29 volumes totalling close to 17,000 pages) leads us to believe that the routes shown by broken lines on the two maps are those for which the parties actually applied in the sense that they had filed applications therefor and actively, by brief and by oral argument before the Board, sought. Only such routes as included proposed passenger service are included in these maps.[5]

As indicated by the legends to the two maps above, the broken lines represent the routes sought respectively by Piedmont and by State.[6] It will be noted that the solid route lines are identical in both maps, they being, of course, those awarded to Piedmont by the Board's decision of April 4, 1947.

Turning now to a critical comparison of the routes sought by Piedmont with the routes it was awarded, we believe that even a superficial examination of Map No. 1 reveals with certainty that Piedmont did not apply for, and hence was not an applicant for, the routes which the Board has authorized it to serve. The broken lines on Map No. 1 evidence Piedmont's plan to operate on routes running predominantly north and south and to serve points lying east of the mountains. The only point Piedmont proposed to serve which was in any sense across the mountains was Knoxville, Tennessee, and that point is not west of all the mountains and, as can be seen, was not one of the points which the Board ultimately authorized Piedmont to serve. It will also be noted from examination of Map No. 1 that Piedmont's broken-line (proposed) routes coincide exactly with the Board's (awarded) routes in only two places and there, in each case, for only very short distances and only between two adjacent points on a branch route.[7] Of the total of 39 points which Piedmont proposed to serve, only 9 lie along routes awarded by the Board. We think it completely obvious that Piedmont did not, in fact, specifically apply for the routes it was awarded by the Board.

■ Respondent tacitly concedes that Piedmont did not specifically apply for the awarded routes but directs the bulk of its argument on this issue to its claim that Piedmont's application was "sufficiently broad" (by virtue of a so-called "catch-all clause" in the Piedmont application) to justify its being considered an applicant. This "catch-all clause" as contained in Piedmont's amended application states that Piedmont applies "for the authorization to engage in scheduled air transportation as an air carrier of passengers, mail and property, in local and feeder passenger service and mail, express and property pick-up service *on the routes detailed herein,* or such modification of *such* routes as the Board may find public convenience and necessity require." (Emphasis supplied.) We do not read this clause as requesting, in any sense, authority to operate on the routes ultimately awarded in this case. We do not agree with the Board and with Piedmont that (referring again to Map No. 1) the routes represented by the solid lines are a mere modification of the routes represented by the broken lines. Such a claim seems to us to be a distortion of reality and a totally unreasonable, capricious, and arbitrary interpretation of the word "modification." To be sure, the word "modification" normally connotes change or altering, but such change or altering must not be great and must not result in so transforming the original thing to be modi-

---

[5] Piedmont's original application was much broader than that shown graphically in Map No. 1. Originally, Piedmont sought a certificate covering mail, passenger and property transportation combined with an automatic mail pick-up service. As amended, Piedmont's application still sought authority to operate the mail pick-up service but it asked *separately that it be authorized to carry* passengers, mail, express and property over 5 specified routes. It is those 5 routes only which are shown by the broken lines on Map No. 1.

[6] This is true of all broken route lines on both maps excepting only the short broken line (appearing near the lower right-hand corner of both maps) between New Bern and Morehead City and indicated by an arrow and the designation "Seasonal Service."

[7] We here refer to the coincidence of the broken and solid lines between Roanoke, Virginia, and Lynchburg, Virginia, and between Richmond, Virginia, and Norfolk, Virginia.

fied as to make of it something entirely new and different in substance. Volume VI of The Oxford English Dictionary (1933 Edition) defines "modification" as "the action of limiting, qualifying, or 'toning down' (a statement, etc.); a limitation, restriction, or qualification." In Linn v. Linn,[8] the Supreme Court of Alabama said: "Modify ordinarily is not used in a sense of completely setting aside the thing to be modified, but to limit, qualify or moderate." Further convincing proof of the fact that Piedmont was in no sense an applicant for the routes awarded and that Piedmont itself did not consider that its "catch-all clause" was sufficiently broad to cover the awarded routes is contained in the statement made by Piedmont's president when asked if he would be willing to serve Greensboro-High Point[9] if service to that point were authorized by the Board. His reply was as follows:

"Yes, sir. I would like to have it understood here, now, that any point not included on our proposed routes, *which are along our proposed routes, and which would not materially upset our plan of operation,* that the Civil Aeronautics Board saw fit for us to service, we would be delighted to serve it." (Emphasis supplied.) Piedmont having taken this position before the Board, it is not difficult to believe that Piedmont was the most surprised applicant of all when the Board announced its decision awarding Piedmont routes which are certainly not "along" Piedmont's "proposed routes" and routes which certainly do "materially upset" Piedmont's "plan of operation."

To be sure, the decision of what is or is not a modification of a given set of proposed routes is one which resolves itself in a fundamental question of fact and we recognize that it is not the function of this court to find fact or to substitute its judgment for that of the administrative tribunal on pure questions of fact concerning which opinions may reasonably differ. However, that is not this situation. We here rule, on the facts presented and uncontroverted, that no reasonable mind could conclude that the routes awarded in this case to Piedmont were merely a modification of the routes proposed by it. The implied finding by the Board that Piedmont was an applicant for the routes awarded lacks the support of any evidence, substantial or otherwise. In ruling thus, we have not said, and we do not wish to be understood as ruling, that the Board may not take advantage of a "catch-all clause" in an application by granting routes which represent slight deviations from those proposed. For example, referring for the moment to Map No. 2, if Piedmont had applied for the routes set forth by the broken lines, the Board might well have granted authorization to provide seasonal service between New Bern and Morehead City (indicated by arrow in lower right-hand corner of the map). Similarly, the addition of the two points indicated by circled stars (London-Corbin and Middlesboro-Harlan) on the route running between Bristol and Lexington-Frankfort would seem to be an appropriate "modification" of such proposed route.

II. *Can the Board award a certificate to one who was not an applicant for the routes authorized by that certificate?*

Although the determination of this second question requires our answer to a question not hitherto posed before any other court, so far as we are aware, yet we are not without ample guides, in the form of language of statute and of Commission-made rule and regulation, which point the way toward correct solution of the problem.

With regard to certificates of public convenience and necessity, the Act, after providing that no air carrier shall engage in any air transportation without a certificate,[10] states in Section 401(b) that:

"Application for a certificate shall be made in writing to the Board [originally the Authority] and shall be so verified, shall be in such form and contain such information, and shall be accompanied by such proof of service upon such interested

---

[8] 1942; 242 Ala. 688, 8 So.2d 187, 188.

[9] Note, on Map No. 1, the relatively short distance between Greensboro-High Point and the closest point on Piedmont's proposed route, namely, Winston-Salem.

[10] The few exceptions to this general statutory edict are not here relevant.

persons, as the Board shall by regulation require." [11]

In Section 401(d) of the Act we find the following significant language with regard to issuance of certificates:

"(1) The Board shall issue a certificate *authorizing the whole or any part of the transportation covered by the application*, if it finds that *the applicant* is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this chapter [originally this Act] and the rules, regulations, and requirements of the Board hereunder, and that such transportation is. required by. the public convenience and necessity; otherwise such application shall be denied.

"(2) In the case of an application for a certificate to engage in temporary air transportation, the Board may issue a certificate *authorizing the whole or any part thereof* for such limited periods as may be required by the public convenience and necessity, if it finds that *the applicant* is fit, willing, and able properly to perform such transportation and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder." [12] (Emphasis supplied).

An analysis of the above-quoted language of both subsections of Section 401 (d) reveals that, upon making the two requisite findings (as to fitness, willingness, and ability and as to public convenience and necessity), the Board either "shall," in the case of an application for a permanent certificate, or "may," in the case of an application for a temporary certificate,[13] issue a certificate to an *applicant* authorizing it to serve "the whole or any part" of the transportation covered by the application.[14] In line with our holding in the first part of this opinion, it might well be said that, since Piedmont was not in fact an applicant for the awarded routes, it does not come

within the purview of the above-quoted portions of the Act (which obviously contemplate that the authorized transportation awarded be that for which one is an applicant) and that therefore any award by the Board in such circumstances is one made without sanction of Congress and in excess of its delegated powers. The Act, except for the negative inference to be drawn from the lack of express provision therefor, is silent as to the Board's power by delegation to issue a certificate to a non-applicant. Doubtless such action was never contemplated by the drafters of the Act. We think it clear that such unprecedented action is not, and cannot be, included within the familiar concept of the power of an administrative agency, having only delegated power, to "fill up the details." [15]

But there is another and more specific thing which renders the Board's action in this case invalid. As we have indicated above, when considering applications for a certificate, permanent or temporary, the Board *must* (1) find that the new routes are "required by the public convenience and necessity" and (2) find that the applicant is "fit, willing, and able" to perform such transportation. In this case the Board has found that public convenience and necessity require that air transportation be rendered along the routes shown by the solid lines on Maps 1 and 2. We have no quarrel with that finding. There is abundant and substantial evidence in the record to support it. However, the Board also found, using the precise terminology of the Act, that Piedmont was fit, willing and able to perform properly the air transportation found required, and to comply with the rules, regulations and requirements of the Board. It is this latter finding which is not only unjustified on the basis of the record, but unjustifiable. In Braniff Airways, Inc. v. Civil Aeronautics Board,[16] this court said:

---

[11] 52 Stat. 987 (1938), 49 U.S.C.A. § 481.(b).

[12] 52 Stat. 987 (1938), 49 U.S.C.A. § 481(d).

[13] In both its original application and in the amendment thereto Piedmont sought a "permanent and/or temporary" certificate.

[14] The word "thereof" in subsection (2) obviously refers to the word "transportation" preceding it in that subsection.

[15] See vom Baur, Federal Administrative Law (1942), Vol. 1, pp. 24-5, footnote 86.

[16] 1945, 79 U.S.App.D.C. 341, 342 147 F.2d 152, 153.

"The Act does not define 'fit, willing and able' but the Board has established these tests: (1) a proper organizational basis for the conduct of air transportation; (2) a plan for the conduct of the service made by competent personnel; (3) adequate financial resources."

That opinion went on to state that a finding by the Board, when made, was supported by substantial evidence of the fitness, willingness, and ability of the applicant in that case, but this court then reversed the Board because there was evidence of changed conditions since the Board made that finding which required a new hearing so that present facts could be determined. In the instant case, we have presented the still stronger situation wherein, even at the time of the Board's finding that Piedmont was fit, willing, and able, there was *no* evidence of Piedmont's appropriate qualification for the awarded routes. We find the record before us barren of any evidence put in by Piedmont to show its fitness, willingness, or ability to operate west of the Appalachians or over mountainous terrain. In fact, Piedmont's evidence was to the contrary. Counsel for Piedmont in oral argument before the Board made the following significant statement with regard to the non-mountainous character of the terrain covered by Piedmont's passenger application (as shown on Map No. 1):

"Consider how this route as proposed by Piedmont connects Charlotte with its secondary centers, both north and south, and how north of Winston Salem it follows the Shennandoah [sic] Valley, crossing the Blue Ridge Mountains at only one point, the southernmost end of those mountains where they are very low."

Contrasting this emphasis by Piedmont on north-south routes which avoid mountainous terrain as much as possible with the routes actively sought by State running generally east-west over the Appalachians at approximately their highest and widest point, it is at once apparent that Piedmont made no attempt to qualify itself for the service of the area it was ultimately authorized to serve. This is further shown by the fact that Piedmont based all its evidence and exhibits on the performance of a single-engine, uncertificated plane, the Noorduyn Norseman V, whereas State proposed to use twin-engine planes. Respondent argues before this court that it makes no difference who puts in evidence concerning the proposed trans-Appalachian feeder service. This is undoubtedly true as to whether or not the routes are required by the public convenience and necessity for if the routes are so required it is immaterial which, if any, of the applicants demonstrates that this need exists. However, as applied to the requisite finding of fitness, willingness, and ability, it is very important indeed which of the applicants has put in evidence concerning the routes ultimately awarded. It is obvious from the record that State introduced abundant and convincing evidence, procured through exhaustive research, which indicated State's careful planning with a view to rendering service to the very area and the very routes and points which it proposed and which were ultimately awarded to Piedmont. The Board impliedly concedes that State had thus not only established the need but proven its fitness to serve those routes and points. The Board in two different opinions indicated that the choice between State and Piedmont "presented a close and difficult question." The Board, in its opinion of December 12, 1947, stated that it was "fully aware of the interest State has shown in this matter and of the thoroughness with which it planned and prosecuted its application both in establishing convenience and necessity and in urging its selection as the carrier to operate local and feeder routes in the Southeastern States area." But it then discounted this by stating that Piedmont had also "energetically prosecuted" its application for routes in the same area and stated that: "Enthusiasm and interest cannot alone control the choice." We agree with this statement. What *should* control the choice (and what did not control it here) is the determination of which, if any,[17] has proven himself fit, willing, and able to adequately serve *the routes which have been found to be required by the public convenience and necessity.*

---

[17] The last sentence of § 401(d) (1) clearly shows that there need not be any successful applicant in a given proceeding.

It does not follow, and we believe it cannot follow, that proof of fitness, willingness, and ability to operate along basically north-south routes, paralleling existent surface travel, and avoiding mountainous terrain is equivalent to proof of qualification to operate on basically east-west routes, generally at right angles to the major lines of flow of existing surface travel, and crossing large areas of a very mountainous region.[18] The absurdity of such a claim is demonstrated by the extreme position which counsel for the Board was compelled to take in oral argument before this court in defense of the action taken by the Board. When questioned from the bench in oral argument before us, counsel for respondent Board admitted that it was the Board's claim that if Piedmont had applied for a route from Hagerstown to Norfolk in a southeastern area proceeding, the Board could award Piedmont the Miami to Jacksonville route. In such a case, as in the case at issue, the sociological, economic and topographical factors are so variable as to render any attempt to use such factors as are introduced to support the granting of a particular route totally valueless in considering another and substantially different route.

■ Petitioner has cited numerous instances where the Board has, by rule, regulation, and decision in other prior cases, established a rigid policy of rejecting applications not in proper form and of denying the applications of those applicants who have not applied for the routes found necessary. Whether or not this is true, it is not, and cannot be, a determinative factor in this case. It is generally true that administrative agencies are free from the application of the judicial doctrines of *stare decisis* and *res judicata* as those doctrines may be advanced *as to prior administrative determinations*. Stated more simply, an administrative agency is not bound by its own prior determinations, though the courts may take those prior determinations into consideration.[19]

■ From the foregoing it is apparent that we answer both of the questions posed as the major issues in the case in the negative. We expressly rule that the Board's findings (except as to the finding that the routes were required by the public convenience and necessity) were, in the legal sense, arbitrary and capricious and lacked the support of substantial evidence. Accordingly, we must reverse the decisions of the Board insofar as they resulted in the granting of a certificate to intervenor herein, Piedmont. Petitioner, State, also asks that this court reverse and remand to the Board with instructions to issue a certificate to State. Whether or not it is so that the Board has already made the requisite findings which would entitle State to a certificate, we agree with respondent that this court lacks the power to order the issuance of a certificate which the Board has declined to issue. We do not read the allegedly pertinent section of the Administrative Procedure Act with its mandate that this court shall "compel agency action unlawfully withheld." [20] as requiring that result. On the contrary we regard ourselves bound in this respect by the decision of the Supreme Court in Federal Communications Commission v. Pottsville Broadcasting Co.[21] The case is therefore

Reversed and remanded for further proceedings not inconsistent with this opinion.

EDGERTON, Circuit Judge, dissents.

---

[18] The area over which the Board authorized Piedmont to fly contains the two highest mountains east of the Mississippi, namely, Mount Mitchell (6,684 feet) in North Carolina and Clingman's Dome (6,643 feet) in Tennessee, both of which are higher than the perhaps more famous Mt. Washington (6,288 feet) in New Hampshire.

[19] See vom Baur, Federal Administrative Law (1942), Vol. 1, §§ 74, 183 and 255-9, and cases cited therein.

[20] Section 10(e), 60 Stat. 243 (1946), 5 U.S.C.A. § 1009(e).

[21] 1940; 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656.