## POLICE COMMISSIONER OF BALTIMORE CITY *v.* KING ET AL.

[No. 128, September Term, 1958.]

128

*Decided February 17, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Clayton A. Dietrich, Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellant.

*Francis J. Meagher,* with whom were *Goodman, Meagher & Enoch* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal by the Police Commissioner of Baltimore City from a writ of *mandamus* by the Superior Court of Baltimore City directing him, as trustee of two separate funds, to pay benefits and allowances to the appellee, Elizabeth C. King, as widow of Patrolman August D. King, deceased, and upon her death or remarriage to pay unto the appellee, Edward A. King, as the son of the deceased, the benefits from one of the funds.

There are four funds from which death benefits are payable to the beneficiaries of deceased members of the Baltimore City Police Department. There is a fund, created by a Memorandum of the Police Commissioner in 1948, which is in the nature of a trust agreement between the Commissioner and the members of the Department. The trust provided for the payment of five cents a week into the fund for a death benefit of "approximately $2,500." This fund was amended by another Memorandum of the Commissioner in 1950 which provides for increased contributions thereto, and an extension of the scope of the benefits. This contractual fund is hereinafter referred to as the "Trust Fund." It now provides for the payment of approximately $2,500 to the widow, children *or estate* of any member of the Department who "is killed or dies of injuries sustained while on active duty."

There are two statutory police pension funds created by the Public Local Laws in Article 4. The Special Fund is codified as Sections 580-596, *Charter and Public Local Laws of Baltimore City* (Flack, 1949) and provides for the payment of benefits to the widow or children of a deceased member of the Department who shall have been killed "while in the actual performance of duty," or shall have died in consequence of injuries received "while in the discharge of duty."

A subsidiary pension fund known as the "Special Fund for Widows" was created by Chapter 280, Acts of 1939, and is codified as Sections 587 and 588, *supra*. The appellee is receiving $93.75 a month from this fund which is not involved herein.

There is a fourth general municipal pension fund known as the Employees' Retirement System of Baltimore City.

This latter plan has no application to this appeal, but was referred to in the testimony.

Patrolman King died on April 20, 1956, as the result of a gunshot wound in the chest which he received at about 2:35 p. m. in the afternoon while descending the stairway from the second floor of his home. In the ordinary course of events, he would have left in about 25 minutes to report for duty. Although there were no eyewitnesses to the incident which caused his death, there is testimony that he had been viewing the baseball game on television with his son on the first floor of their home and had gone upstairs to ready himself for work. After an elapse of about five minutes the son, who remained in the living room viewing the baseball game on television, heard his father start down the steps. The son testified that although he did not see his father at the time he was shot, he heard a slip followed by an explosion of the gun. As the son turned his head toward the hallway entrance to the living room, he saw his father, bent over, come off the bottom step, fall against the far hallway wall and drop his equipment. There is no testimony to establish any reason for King's returning to the living room partially dressed. At that time he had on his shoes, pants and suspenders and was carrying his shirt, tie, cap, keys, claw and gun. The pistol was not in the holster. The holster was on the belt and empty. There is no testimony as to what caused the shot to be fired from the pistol. It is undisputed that King died as the result of the gunshot wound which he received at that time and place. There is nothing in the testimony to indicate suicide. All questions concerning procedure were waived.

It will be unnecessary to set forth in more detail the Memorandum of the Police Commissioner with reference to the Trust Fund or the statutes relative to the Special Fund; since it is plain, from what has been said above, that if Patrolman King were killed or died of injuries sustained "while on active duty" within the meaning of the Commissioner's Memorandum the trial court was correct in its ruling concerning the Trust Fund, and, if he were killed "while in the actual performance of duty," or died in consequence of injuries received "while in the discharge of duty," within the meaning

of the relevant statutes, the trial court was also correct in its ruling relative to the Special Fund.

## I

We shall first consider the Trust Fund, and determine what the parties to the Police Commissioner's Memorandum intended by the words "Member[s] of the Department * * * while on active duty." The learned trial judge construed them as meaning all members of the Police Department who were not on inactive duty, leave of absence or retirement status such as "retired officers, officers on vacation and not subject to immediate call-back, and similar classifications of personnel not currently performing active day to day police duties." In other words, he held that "active duty" was intended to embrace the entire membership of the Department who occupied an "active" status rather than to describe the nature and character of the duty in which the officer must be engaged at the time of his death or injury in order to bring him within the provisions of the agreement. Such an interpretation, without limitation, would mean that all members of the Department occupying an "active" status would be protected by the Trust Fund if they were killed or received an injury resulting in their death *at any time and at any place,* which, in effect, would be insurance against being killed or receiving an injury resulting in death while occupying an "active" status in the Department.

We do not think the parties intended the phrase to encompass such a broad scope. Nowhere in the agreement nor in the Police Regulations offered in evidence is there a definition of "active duty," but the history of the Trust Fund furnishes an insight into the intention of the parties. It was created in 1948 and provided that every member of the force should contribute five cents, weekly, which would be utilized to pay approximately $2,500 to the widow and/or children of any member "who is killed or dies of an injury sustained in the line of duty—THE RESULT OF VIOLENCE while attempting to or actually making an arrest." The Memorandum predicted that the plan would produce $5,000, annually, which would pay approximately $2,500 to the widow

and/or children of deceased members if not more than two "such incidents" occurred in any one year; but, if there were "three or more deaths by violence" in any one year the payments would be computed on the basis of yearly receipts, supplemented by any balance in the account. It is thus seen that at its inception the Trust Fund anticipated a very narrow range—the payment of benefits for death as the result of violence while attempting to or actually making an arrest, with the estimated number to receive such benefits at not more than two or three per year. In 1950, the plan was changed by striking out the provision for the payment of benefits for death or injury in making arrests and substituting therefor a provision that benefits in the same amount would be paid to the widow and/or children *or the estate* of "any member of the Department who is killed or dies of injuries sustained while on active duty." This 1950 agreement also provided for the payments by the members of ten cents, weekly, until the surplus in the Fund reached $40,000, at which time the contributions would revert to the previous payments of five cents per week. While there are no actuarial tables in evidence, it seems highly improbable that the parties anticipated the benefits from this Fund to be insurance against being killed or injury resulting in death of all members of the Department at any time or place, simply because they occupied an "active" status in the Department. In fact, it seems doubtful that the fund, thus construed, would be sufficient to pay benefits to the widows, children and estates of deceased members, much less to have any reasonable anticipation of accumulating a surplus of $40,000. Moreover, such plans as we are now considering and statutes designing kindred plans do not ordinarily create a system of insurance, but are designed to protect against hazards involved in the service rendered by the deceased. *Renz v. Hibbing Firemen's Relief Ass'n,* 243 N. W. 713 (Minn., 1932); *State v. Board of Trustees,* 174 N. W. 465 (Wis., 1919); *Dillard v. City of Los Angeles,* 118 P. 2d 345, 348 (Cal., 1941). In our view of the case, the interpretation of the phrase "while on active duty" made by the trial judge was entirely too broad.

We think the words "while on active duty" refer to the

nature and character of the duty being performed by a policeman at the time of his death or injury rather than to his general status in the Department. We, therefore, hold that a policeman is on "active duty" within the meaning of the Memorandum at all times when he is actually and in fact discharging his duties as a police officer. But even during these times the Fund does not function as general insurance. It does not entitle the widow and/or children to benefits for death under all circumstances and from every cause during the period of a policeman's duty. There must be some causal connection between the death or injury and the deceased's duty as a policeman. *Dillard v. City of Los Angeles, supra;* Anno., 27 A. L. R. 2d 1004; *City of Fort Smith v. Hairston,* 120 S. W. 2d 689, 691 (Ark., 1938).

The above conclusion renders the words "while on active duty" as used in the Trust Fund the equivalent of "while in the actual performance of duty" and "while in the discharge of duty" in the Special Fund; so we proceed to a consideration of the Special Fund, as our answer as to the appellee's rights to benefits must be the same as to both Funds.

## II

In considering the Special Fund we must answer the following question: Is a police officer, who is in the course of dressing and preparing to leave his home to go to the police station and receives a self-inflicted accidental fatal gunshot wound from his service revolver while partially dressed and carrying items of his police uniform and equipment from the second to the first floor of his home, either "killed while in the actual performance of duty" or is his death the "consequence of injuries received while in the discharge of duty"?

The appellee suggests that acts of the nature now under consideration should be liberally construed; that the Regulations of the Police Department required King "to be on duty or ready for duty at all times" and to "be suitably armed * * * at all times"; and that this Court has recognized an analogy between the terms "in the actual performance of duty" as used in the statute presently under consideration and

"arose out of and in the course of employment" as used in the Workmen's Compensation statutes.

We agree that the acts should be liberally construed and that the Regulations required King to be *suitably* armed at all times; although we doubt, as contended by the appellee, that this required him to be armed 24 hours each and every day. In denying a policeman's widow's right to a pension where the officer, who had been attacked by a prisoner whom he was conveying to the police station in an automobile, appeared to be sick when he arrived at the police station and was directed to go home before his tour of duty expired, and while driving his own automobile home was fatally injured in a collision, the Court said in *Dillard v. City of Los Angeles, supra,* 118 P. 2d at page 348:

> "When liberally and reasonably interpreted * * * the Charter section in question must be construed as providing for the payment of a pension when a police officer dies as a result of any injury received while he is actually discharging his duty as such officer, or from sickness caused by the actual discharge of his duties. In other words, there must appear to be some causal connection between the injury or sickness which results in death and the performance of police duty. So construed, the pension provisions would apply not only when a police officer was on regular duty, but when he was on emergency duty as well."

The above case seems particularly apposite here; because the Court was not only construing terms of a statute almost identical with the crucial terms now under consideration but also a police order that provided that "[f]or all purposes a police officer is considered as being on duty 24 hours each day," which the Court held simply required all officers, when not on regular duty, to hold themselves in readiness for emergency duty.

It is also true that we have recognized a striking analogy between the terms "in the actual performance of duty" and

"out of and in the course of his employment." *Rumple v. Henry H. Meyer Co., Inc.,* 208 Md. 350, 357, 118 A. 2d 486.

The appellee cites, with some enthusiasm, the case of *Heaps v. Cobb,* 185 Md. 372, 45 A. 2d 73; but we shall not consider it at length since it turned upon the well-established principle that when an employer furnishes free transportation to and from work to an employee, the employee is deemed to be on duty during transportation. There is no similar situation here. We have consistently recognized the general rule that injuries sustained by employees while going to or returning from their regular place of work do not "arise out of and in the course of their employment," [1] but in this case we are requested to hold that one who is dressing himself prior to starting on his trip to work is "in the actual performance of duty" or "in the discharge of duty." We think this would extend the rule entirely too far.

In *Glaeser v. City of Buffalo,* 187 N. Y. S. 339 (Sup. Ct., 1921), a widow was allowed a pension where her husband, a policeman, had been stationed on duty at railroad shops for 13 hours a day pending a labor strike. He had no place to obtain food except at the lunch counter provided by the railroad for its employees. He partook of such food which produced ptomaine poisoning and death. The Court upheld an award by the board, which granted the widow a pension, on the ground that the policeman was killed in the actual performance of duty or died from the effects of injury while in the actual discharge of duty. The Court stated that the case was a "border one," and it was discussed and not followed in *State v. Glassco,* 149 S. W. 2d 848 (Mo., 1941). In fact we have found no case wherein the decision has been approved or followed.

In *McColgan v. Board of Police Com'rs,* 19 P. 2d 815 (Cal., 1933), a pension was denied a widow of a policeman who was killed in an automobile accident after he had gone off duty and was on his way home. There was a similar holding in *State v. Glassco, supra,* where the police officer reported off duty and went to board a street car on the ground that he was

---

1. *Rumple v. Henry H. Meyer Co., Inc., supra.*

not "in the actual performance of duty." And there was a like ruling in *Dillard v. City of Los Angeles, supra,* to which we have already referred.

We think that a liberal and reasonable construction of the terms "while in the actual performance of duty" and "while in the discharge of duty" renders to them a meaning, as we have indicated above, of being the equivalent of the term "while on active duty" in the Trust Fund. We stated above the times when death or injury must occur and the nature of the death or injury requisite to the receipt of benefits from the Trust Fund. We think the same applies here. As Patrolman King was off-duty and not performing or discharging any actual police duty at the time of his unfortunate accident, we must hold that he was not in the actual performance or discharge of duty. Although we sympathize deeply with the widow and family of this faithful policeman, we are compelled to construe the Memorandum relating to the Trust Fund in accordance with the intention of the parties, and the statutes relating to the Special Fund in accordance with the intention of the legislative body that enacted them.

At the argument, counsel for the appellant stated that in the event of reversal, the appellant would not object to paying the costs.

*Order reversed, costs to be
paid by the appellant.*