Fredrick C. MITCHELL and Floyd D. Driver, Plaintiffs-Respondents,

v.

CITY OF SPRINGFIELD, Missouri, and E. L. Anderson, Sam Robards, Charles Upp, Vic Rohrer, H. C. Boehm, Paul Brookshire and Charles Hicks, as members of the Board of Trustees of the Policemen's and Firemen's Retirement Fund of the City of Springfield, Missouri, Defendants-Appellants.

No. 8577.

Springfield Court of Appeals.

Missouri.

Nov. 14, 1966.

Motion for Rehearing or to Transfer Denied Dec. 14, 1966.

Application to Transfer Denied Feb. 13, 1967.

Don G. Busch, Springfield, for defendants-appellants.

Benjamin J. Francka, Springfield, for plaintiffs-respondents.

COTTEY, Special Judge.

The City of Springfield has by ordinance adopted a policemen's and firemen's retirement plan which makes available two types of pensions for members who are retired for disability: 1st, a "non-duty disability" pension, under which one-half the member's average annual salary is payable

to him if his disablement is "not the direct result of occupational duties"; and 2nd, a "duty disability" pension, under which two-thirds of his salary shall be paid him if he is "disabled as the direct result of occupational duties, including but not limited to accidents and/or hazards peculiar to the employment." The ordinance vests "exclusive jurisdiction of all retirement claims" in a Board of Trustees consisting of the mayor and three members each from the Fire Department and the Police Department. The decisions of the Board are "subject to review by writ of certiorari," and that method was followed in the case before us; but the extent of the review is governed by V.A.M.S. Chapter 536. State ex rel. Police Retirement System of City of St. Louis v. Murphy, 359 Mo. 854, 224 S.W.2d 68, 72.

In the winter of 1963 respondents Driver, 44, and Mitchell, 45, veteran members of the Fire Department, were found to be totally and permanently disabled from heart ailments. Both applied for duty disability pensions. Both were directed to submit to examination by a panel of physicians appointed by the Board pursuant to the provisions of the ordinance, and both did so. The findings and conclusions of the examining physicians were substantially alike in both cases. On the basis of the physicians' reports the Board, without a hearing, denied duty disability pensions but awarded non-duty disability pensions to both men. Both thereupon demanded, and ultimately obtained, a hearing before the Board on the question of their entitlement to the larger pension. Their claims were consolidated and heard together, and both were again denied. On certiorari to the circuit court some additional testimony was taken, not germane to the immediate discussion, and a judgment was entered reversing the Board's decision and remanding the case with instructions to award the duty disability pensions. From that judgment the Board appeals. The issues fall under four main heads and require us, 1st, to examine the purpose and scope of the plan, 2nd, to review the evidence touching respondents' claims, 3rd, to consider the effect of the Board's precedents in similar cases, and 4th, to determine whether respondents were accorded a fair hearing before the Board. Of these, in order.

█ It has generally been held with regard to plans of this kind that by contrasting disabilities which are *"not* the direct result of occupational duties" with those which *are,* a purpose is disclosed to distinguish the two in a very material particular, viz., as to their *cause,* and by this method to afford, in the first instance, a benefit in the nature of ordinary health and accident insurance to every member who, during the term of his service, loses his health from any of "the thousand natural shocks that flesh is heir to," but, in the second, to reserve the more substantial pension for him who sacrifices his health in the public interest and who, on that account, is the more meritorious object of public concern. But as the benefit is larger, so the burden of establishing entitlement to it is greater; for whereas in the first instance the claimant has only to prove that he is permanently and totally disabled, in the second he must go a step farther and show a direct causal connection between his duties and his disability, or, as one case puts it, that his disability "occurred *because* he was a fireman rather than merely *while* he was a fireman." State ex rel. Johnson v. Board of Trustees of Firemen's Pension Fund of City of Madison, 170 Wis. 154, 174 N.W. 465; State ex rel. King v. Board of Trustees of Firemen's Pension Fund of Kansas City, 192 Mo.App. 583, 184 S.W. 929, 932; Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W.2d 181, 182, 27 A.L.R.2d 965; Police Commissioner of Baltimore City v. King, 219 Md. 127, 148 A.2d 562, 565; Renz v. Hibbing Firemen's Relief Ass'n, 186 Minn. 370, 243 N.W. 713, 714–715; annotation 27 A.L.R.2d 974, 978 et seq. The language of the ordinance, however, does not require the victim's duties to be the "sole cause" of his disability, but only that his disability be the "direct result" of

his duties. Those terms are not synonymous. Whatever is the product of two or more concurrent and contributing causes is the direct result of each, though neither is the sole cause. Fawkes v. National Refining Co., 341 Mo. 630, 108 S.W.2d 7, 11. It follows, in our opinion and as respondents contend, that aggravation of an existing physical condition, to the point where the condition is rendered disabling, may entitle the victim to a duty disability pension *if*, but *only* if, the aggravation itself is shown to have been "the direct result of occupational duties." In such a case the chain of causation remains intact, linking the disablement with the duties that conduced to it. McQuillin, Municipal Corporations, § 12.149, p. 633. Having established that as the point of view from which the evidence ought to be examined, we turn to the evidence itself.

At the hearing before the Board respondents gave detailed accounts of the physical stress and mental strain, of the danger, tension and exhaustion, to which they had regularly been subjected in the performance of their duties over the years. Both gave histories of noticing some loss of stamina, of feeling "sluggish" and "slowing down," for a period of about two years before their retirement, and of episodes of chest pains at intervals during the latter part of that period. The last such experience, in Driver's case, occurred while he was washing a truck on the final day of his active service; in Mitchell's while he was watching television in the station house on the last day of his actual service. Both men had been medically examined during the period of their service, but no evidence of heart trouble had been found prior to their retirement.

It was established by the reports of the examining physicians, as supplemented by their testimony, that Driver and Mitchell were both disabled from myocardial infarctions which were the end product, in Driver's case, of atherosclerosis, and in Mitchell's, of arteriosclerosis. Both ailments are commonly known as hardening of the arteries, the former affecting the larger vessels, the latter the smaller. In their progress and effect they are substantially identical; each is characterized by a diminution of the elasticity of the vessel walls, by the gradual formation of a scaly deposit on the interior of the walls, and, in consequence, by an obstructed passage and a diminished supply of oxygen-carrying blood to the heart muscle. The exact cause of the "disease" is unknown, "but the current feeling is that this is related to the amount of fats taken in the diet." It is, in any event, "a gradual process that covers a period of time." The infarction to which it so frequently leads may occur "during or after severe exercise," or, on the other hand, simply "upon hearing bad news," or even while the sufferer "is asleep." "Exertion isn't necessary" to produce it; in fact, "exercise does not appear to be a factor in the overall figures, so that a group of acrobats and a group of office workers will have roughly the same incidence of myocardial infarction in the United States." It was the opinion of these physicians that Driver's condition was, "in all probability, not related to his occupation," and that it cannot be said "that his occupation was an aggravating cause." Of Mitchell's condition they said, "it is not an occupational disease and in this incident was not precipitated or aggravated by accident"; that "it would have occurred regardless of what occupation he performed." And of both, "I doubt that we can call either of these patients disabled on the basis of a duty connected disability."

The only other witness was a Dr. Skolnick who had written several articles on the occupational diseases of firemen, a subject in which he had interested himself "as a hobby, not as a livelihood." He had not examined respondents. By listening to the testimony, however, he had acquired a sufficient grasp of the problem to form some very definite conclusions on it. He gave the Board the benefit of them. He deprecated the "vague conclusions" of the examining physicians as "to the cause of

the disabilities of the firemen involved today," because they left the subject "in a state of confusion." It was "an unnecessary state * * * the disease is unimportant." To require respondents to prove the cause of their disability would be to "punish two men who were firefighters" and who had "developed a problem." Such an approach would be "inhuman in many ways." The real issue before the Board was simply this, "Have they been firefighters, are they able to stay firefighters?" That was "all the question involved"; and it was "a legal problem, not a medical problem." He qualified himself to discuss that aspect of it by declaring, "I know all the laws, I have helped make many of them." The Board was only being asked "to fulfill the obligations that the people have put on the books for the purpose of helping those who have been hurt trying to help us." "Your voters have given you a blank check," he explained, "give it to those who deserve it." And in determining the question of deserts, "Your conscience has to vote." Against that background he was asked whether, in his opinion, "the sum total of all these men's duties and activities as firemen were the factors that led up to the disability?" In gallant disregard of caution he replied, "The answer is so undoubtedly yes, if you asked it backwards, in reverse, it would even give it the same emphasis. Had these two men not been firefighters they would not have had these heart diseases. And, gentlemen, we just said heart disease as only a convenience. It could have been T. B."

■ Respondents insist the record "re-. quired" the Board to grant them duty disability pensions—presumably as a matter of law, since it "involved only the application of the law to the facts." The hopes entertained for that proposition are more sanguine than the rules of review will allow. The sober truth is that the issue of causation, whether related to the onset of the ailment or to its aggravation, never really took shape, unless in the lively imagination of Dr. Skolnick. And even if his conclusion

be regarded as a medical opinion, instead of an effusion of social philosophy, it was insufficient to carry the point as a matter of law. Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345, 346. It is perfectly clear that there was "competent and substantial evidence" to support the Board's decision. We may inquire no further. V.A.M.S. § 536.140, subsec. 2(3); State ex rel. Bond v. Simmons, Mo.App., 299 S.W.2d 540, 542, 545.

■ The third point for consideration arises on these facts: Since the adoption of the ordinance, five other firemen have been retired for disabling heart ailments. In each case, on the basis of medical reports substantially similar to those made by the examiners in this case, the Board, without a hearing, awarded duty disability pensions. Respondents take the position that, by those five precedents, the Board construed the ordinance as authorizing duty disability pensions in cases of this kind and adopted a policy of awarding them in conformity with that construction; that the Board is bound by that policy, and its refusal to follow it in this case was arbitrary, discriminatory and whimsical. We have been unable to find any law to sustain that proposition. It apparently proceeds upon the assumption that the doctrine of stare decisis applies to administrative tribunals. But the law is exactly the contrary: "administrative bodies are not ordinarily bound by their prior determinations or the principles or policies on which they are based." 73 C.J.S. Public Administrative Bodies and Procedure § 148, p. 482; State Airlines, Inc. v. Civil Aeronautics Bd., 84 U.S.App.D.C. 374, 174 F.2d 510; annotation 79 A.L.R.2d 1126, 1135 et seq. Logic sustains the rule. Were it otherwise, the substantive law which the agency was set up to administer, and which it must necessarily construe in making its judicial determinations, would stand amended by every mistaken interpretation that might be put upon it, its scope distorted and its purpose subverted by a succession of errors which not even the agency itself would afterwards be allowed to correct. If a

policy has been erroneously adopted, the ends of justice will hardly be served by compounding the offense and perpetuating the error. The case at hand is an example in point. If the Board in its five mentioned precedents construed the ordinance as making no requirement of causal connection, then on that *point of law* it was in error. And if, on the other hand, it treated the medical reports as establishing causal connection, then on that *point of fact* it was in error. But is a bad precedent necessarily to be followed by the abuse of it? We think not. We are admonished by impeccable authority to repent our sins and reform our errors, and we know of no principle on which the benefit of that advice can be denied to administrative agencies. One familiar with more venerable precedents may find an analogy between the case at hand and that of the sheep that was lost and returned to the fold. At any rate, the action of the Board in turning from the path of error and resuming its role of responsibility will receive no criticism from us.

■ Finally, it is charged that respondents were denied a fair hearing before the Board because some of its members allowed themselves to be prejudicially influenced in their deliberations by preconceived notions and considerations that ought not have been countenanced; hence, that on this ground the trial court's reversal of the Board's decision was proper. No "timely protest" was made to the Board on that account, as was the case in In re Weston Benefit Assessment Special Road Dist. of Platte County, Mo.App., 294 S.W.2d 353, nor are we able to determine with assurance that the complaint supplied one of the grounds for the trial court's judgment. But in the same state of the record the question was considered and the decision of the administrative agency reversed in Jones v. State Dept. of Public Health and Welfare, Mo.App., 354 S.W.2d 37, and for the reasons there assigned we think it proper to consider it here.

■ Respondents laid the charge of prejudice in their petition for certiorari, and the circuit court held a hearing de novo on that issue. At the hearing, respondents were permitted to produce two members of the Board and two bystanders, all firemen, who testified on direct examination that they had been present at, and had either taken part in or overheard, a discussion between several members of the Board immediately after the vote had been taken on respondents' claim. The gist of their several versions of that discussion was that in the course of it two members, Officers Robards and Rohrer of the Police Department, had made statements to the effect that they "weren't against the men receiving the pension," but that "they could not afford to put every man with a heart condition on a duty disability pension" because it would "bankrupt" the fund; further, that "a man should be performing an act of duty * * * not sitting in a chair, but performing some function of firefighting" before he would be eligible for a duty disability pension on account of a disabling heart ailment. On cross-examination it came to light that discussions of this nature were a rather frequent occurrence among Board members; that the members from the Police Department were committed to the view ascribed to Officers Robards and Rohrer; but, on the other hand, that the Fire Department members were of one mind on the proposition "that firemen get heart attacks more than other people" and, "therefore, they should get duty disability pensions when they have heart attacks"; that "if a fireman has been with the force, say ten years, and has a heart attack, he is automatically entitled to a duty disability pension, * * * that's the way the pension plan was drawn up." For several reasons we think the trial court was not warranted in overturning the Board's decision on that evidence.

In the first place, we are of the opinion that none of it should have been received. There is no more reason for permitting the decision of an administrative tribunal to be impeached by the members' disclosure of

the considerations that entered into it than there is for allowing jury verdicts to be set aside on the testimony of those who return them. The same considerations of practicality and public policy that inhibit such disclosures in the latter instance are equally present and compelling in the former; and they should apply as well to those who did not concur in the result as to those who did. Evans v. Klusmeyer, 301 Mo. 352, 256 S.W. 1036, 1040. The subject is discussed with convincing logic in National Labor Relations Board v. Botany Worsted Mills, Inc., 3 Cir., 106 F.2d 263, and we adopt the result there reached and approve the reasons assigned for it. The testimony of bystanders, it is true, has sometimes been put on a different footing; the logic or illogic of doing so in a given case is reflected in the examples cited in annotation 129 A.L.R. 803. But there is neither rule nor reason for drawing any distinction in this case. Here the bystanders testified only to what the Board members told them, or said in their presence, at a time when the Board was not engaged in the deliberation of its decision. To allow that evidence to be received at second-hand when it would be rejected at first-hand, and to overturn the Board's decision on the strength of it, would be to do by indirection what is forbidden to be done by direction. The subterfuge has never been successful where statements made by jurors under like circumstances were offered to be shown by those who heard them, and we apply the same reasoning here. Meisch v. Sippy, 102 Mo.App. 559, 77 S.W. 141, 143; Herring v. Wabash R. Co., 80 Mo.App. 562, 569; Easley v. Missouri Pac. R. Co., 113 Mo. 236, 20 S.W. 1073, 1075; Green v. Terminal R. Ass'n of St. Louis, 211 Mo. 18, 109 S.W. 715, 719; State v. Lewkowitz, 265 Mo. 613, 178 S.W. 58, 63; Hoffman v. Dunham, Mo. App., 202 S.W. 429, 431; Banks v. Empire Dist. Electric Co., Mo.App., 4 S.W.2d 875, 880; Lightfoot v. Kurn, Mo.App., 164 S.W. 2d 77, 79.

But supposing the evidence to be · fairly before us (because of the inept objection interposed to it in the trial court), what does it prove with regard to the charge of prejudice? It may be conceded that it would have been improper for the members to have decided the case on the basis of the views attributed to them. But how are we to know that they did so? We have no proof that they carried into the solemn deliberations of the Board the improper opinions expressed by them on other occasions, and entered them in the debate and allowed them to dictate the result in disregard of their duty and responsibility; and we may not assume they did so. Each member of the Board "is a public officer, and improper action on his part will not be presumed." In re Moynihan, 332 Mo. 1022, 62 S.W.2d 410, 419, 91 A.L.R. 74. "As long as a man or a body of men fill any official position, the law presumes he or they will perform their duties whenever any matter is legally presented to them for action, notwithstanding general declarations previously made to the contrary." State ex rel. Abbott v. Adcock, 225 Mo. 335, 124 S.W. 1100, 1108. The presumption in favor of the validity of administrative determinations "is, however, a strong one, and clear and convincing evidence is required to overcome it." 73 C.J.S. Public Administrative Bodies and Procedure § 205, p. 558. To the same effect, see Dittmeier v. Missouri Real Estate Commission, Mo., 316 S.W.2d 1, 5–6, certiorari denied 358 U.S. 941, 79 S.Ct. 347, 3 L.Ed.2d 348; State ex rel. Murphy v. Burney, 269 Mo. 602, 191 S.W. 981, 983; ·State ex rel. Ball v. State Board of Health, 325 Mo. 41, 26 S.W.2d 773, 777; 31A C.J. S. Evidence § 146, p. 318 et seq. Where would there be any end to litigation if the rule were otherwise and verdicts and decisions, regular on their face, were allowed to be overturned by speculation as to the reasons that might have been advanced for reaching them? Judge Lamm summed up the sensible view: "Courts are organized to get practical and just results in the administration of law. Therefore, if the right thing be done (though a wrong reason be given for doing it), the thing itself may

stand." Green v. Terminal R. Ass'n of St. Louis, supra, 109 S.W. at 718.

■ Finally, it will not have gone unnoticed that the evidence before us, if it proves anything, proves that the members from the Fire Department were as avowedly in favor of awards in the circumstances of this case as the members from the Police Department were opposed to them. The bias of the one group is just as disqualifying as the prejudice of the other. Thus the Board is destroyed; only the mayor remains. But the Board is vested with "exclusive jurisdiction" to decide these claims; no substitution is authorized, no alternative is provided. In such a case it is said to be the general rule that the Board may discharge its duty notwithstanding the bias of its constituent members, for otherwise its business would be at a standstill. Annotation 39 A.L.R. 1476; 73 C.J.S. Public Administrative Bodies and Procedure § 62, pp. 389–390; Emerson v. Hughes, 117 Vt. 270, 90 A.2d 910, 34 A.L.R.2d 539, 550–551.

■ The decision was judicious and just; perhaps accidentally so, but nevertheless so. Where the end is proper, the means may be much indulged; and seldom with better reason than in the review of proceedings of a tribunal of laymen.

For the reasons stated, the judgment is reversed and the cause remanded with instructions to the trial court to reinstate the decision of the Board.

STONE, P. J., and HOGAN, J., concur.

TITUS, J., not participating because not a member of the Court when the cause was submitted.