*Schwan Food Co. v. Ryan Frederick*,
No. 1289, Sept. Term, 2017, Opinion by Leahy, J.

**Workers' Compensation > Appeals > Presumptions and Burden of Showing Error**

When the employer prevails before the Commission, and the claimant elects an appeal under what is essentially a *de novo* trial pursuant to § 9-745(d), the parties retain their initial burdens of proof and persuasion. *Baltimore Cty. v. Kelly*, 391 Md. 64, 75 (2006). However, when the employer appeals a decision of the Commission decision in favor of the claimant and elects a jury trial under § 9-745(d), "the burden of proof, which was borne by the claimant before the Commission, switches to the employer before the circuit court." *Id.* Accordingly, "[t]he decision of the Commission is, *ipso facto*, the claimant's *prima facie* case." *Id.*

**Workers' Compensation > Appeals > Presumptions and Burden of Showing Error**

The burden before the trier of fact in the circuit court is "upon the appellant to overcome the presumption that the decision of the Commission is prima facie correct," which is why the proceeding is qualified as an "essentially *de novo* trial." *Baltimore Cty. v. Kelly*, 391 Md. 64, 76 (2006) (internal quotations omitted).

**Workers' Compensation > Arising Out of and In the Course of Employment > Questions of Fact and Law**

Typically, whether an injury arises out of and in the course of employment is a mixed question of law and fact. However, "when the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court." *Harrison v. Cent. Constr. Corp.*, 135 Md. 170, 878 (1919).

**Workers' Compensation > Arising Out of and In the Course of Employment**

Whether an injury arises out of and in the course of employment is informed by the "facts and circumstances of each individual case." *Livering v. Richardson's Restaurant*, 374 Md. 566, 574 (2003).

**Workers' Compensation > In the Course of Employment in General**

An injury occurs in the course of employment, within the meaning of LE § 9-101(b)(1), "when it occurs during the period of employment at a place where the employee reasonably may be in performance of his or her duties and while fulfilling those duties or engaged in something incident thereto." *Montgomery Cty. v. Wade*, 345 Md. 1, 11 (1997) (citations omitted).

**Workers' Compensation > In the Course of Employment in General**

As Professor Arthur Larson has explained, the "[i]n the course of" employment requirement "tests work-connection as to time, place and activity[.]" 2 Arthur Larson, et al., *Larson's Workers' Compensation Law* § 12 at 12-1 (Matthew Bender rev. ed. 2018).

**Workers' Compensation > In the Course of Employment > Employee's Home as a Work Site in General**

Whether an employee's home qualifies as a work site under Maryland workers' compensation law is established by three indicia: (1) the quantity and regularity of work performed at home; (2) the presence of work equipment at home; and (3) the special circumstances of the employment rendering it necessary, and not merely personally convenient, to work at home. 2 Arthur Larson, et al., *Larson's Workers' Compensation Law* § 16.10[2] at 16-24 (Matthew Bender rev. ed. 2018). Under the last (third) prong, the fact-finder should also consider whether the employer acquiesced to the employee's use of his or her home as a work site, or reasonably should have known the employee was regularly using the home as a work site. *Cf. Livering v. Richardson's Restaurant*, 374 Md. 566, 580 (2003); *see also Roberts v. Montgomery Cty.*, 436 Md. 591, 606-07 (2014).

**Workers' Compensation > Injuries While Traveling Between Work-Related Sites**

An employee's travel between work-related sites may be deemed incidental to the employment, in which case the going and coming rule would not apply to bar compensation for injuries sustained during the travel. *Roberts v. Montgomery Cty.*, 436 Md. 591, 607-08 (2014).

**Workers' Compensation > In the Course of Employment > Injuries While Leaving Employee's Home to Travel to Another Work-Related Site**

Injuries sustained by the employee en route from the employee's home work site to another work-related site may arise out of and in the course of employment. *Cf. Roberts v. Montgomery Cty.*, 436 Md. 591, 607 (2014) (explaining that when an employee is injured while traveling between work-related sites, such travel is incidental to employment and an injury sustained during such travel is compensable).

**Workers' Compensation > In the Course of Employment > Injuries Before Leaving Employee's Home**

When an employee's home does not qualify as a work site and the injury occurs while performing an activity unrelated to employment and "*before* [a] journey [between the home and work] has begun[,]" the injury falls outside the course of employment. *Prince George's Cty. v. Proctor*, 228 Md. App. 579, 589, 591 (2016).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1289

September Term, 2017

_____

SCHWAN FOOD CO., ET AL.

v.

RYAN FREDERICK

_____

Leahy,
Reed,
Salmon, James P.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: June 27, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"So be sure when you step,
Step with care and great tact.
And remember that life's
A Great Balancing Act."

Dr. Seuss
"Oh, The Places You'll Go!"
(1990)

Technological innovation enables citizens of Maryland to work for companies located anywhere in the world, at any time, from any place in the State.[1] This modern expediency drives the primary issue before us: whether an injury that an employee sustains while leaving his or her home to travel to a work-related site can be deemed to have "arise[n] out of and in the course of employment."[2] In examining this issue, we must address a matter of first impression under Maryland workers' compensation law; namely, whether an employee's home can qualify as a work place or work site.

Appellee, Ryan Frederick, worked as a customer service representative for

---

[1] Dawn R. Swink, *Telecommuter Law: A New Frontier in Legal Liability*, 38 Am. Bus. L. J. 857, 857-61 (2001) (exploring the growing presence of "home-based employees" or "home office workers" due to advances in information technology that are shifting the focus away from centralized workplaces to decentralized workplaces, and the resultant effect on employer liability); *see also* Kenneth G. Dau-Schmidt, *The Impact of Emerging Information Technologies on the Employment Relationship: New Gigs for Labor & Employment Law*, 2017 U. Chi. Legal F. 63, 63, 69-73 (2017) (exploring generally the legal consequences of how information technology has altered aspects of the employment relationship, including the ability to allow "greater disaggregation of the work process in space and time" such that employees can undertake production from geographically disparate workplaces throughout the United States or abroad).

[2] Maryland Code (1991, 2016 Repl. Vol.), Labor and Employment Article ("LE"), § 9-101(b)(1).

appellant, Schwan Food Company ("Schwan"),[3] which is based in Minnesota with no local offices in Maryland. His job entailed traveling in his personal car to various grocery stores throughout Maryland to meet Schwan's delivery drivers and receive inventory deliveries for each of his accounts. On the morning of January 28, 2016, while still at home, Mr. Frederick used his employer-provided handheld computer to download his route for the day. His plan was to drop his son off at daycare on the way to his first account, the Walmart in Ellicott City. Unfortunately, he slipped on black ice on the sidewalk by his car in front of his home and suffered injury to his right leg.

Mr. Frederick filed a claim with the Workers' Compensation Commission ("WCC"). Schwan maintained that Mr. Frederick's injury was not compensable because he was on his way to drop off his son—a personal errand. The WCC issued a summary decision denying Mr. Frederick benefits after finding that "the claimant did not sustain an accidental injury arising out of and in the course of employment[.]" Mr. Frederick petitioned for judicial review in the Circuit Court for Baltimore County on May 24, 2016, and requested a jury trial.

Mr. Frederick's case proceeded to trial before a jury on July 25, 2017. At the close of Mr. Frederick's case, the circuit court denied Schwan's motion for judgment and, at the close of all evidence,granted Mr. Frederick's motion for judgment. The court concluded that Mr. Frederick had been working from his "home office" before he set out to travel to his first account, and consequently, the injury that he sustained "arose out of and in the

---

[3] The other appellant is Schwan's insurer, the New Hampshire Insurance Company.

2

course of his employment."

Schwan timely appealed to this Court from the order reversing the WCC's decision. Schwan challenges the circuit court's determination that Mr. Frederick's injuries arose out of and in the course of his employment with Schwan.

We hold that injuries sustained by the employee en route from the employee's home work site to another work-related site may arise out of and in the course of employment. As detailed in our discussion, in order to determine whether a home qualifies as a work site, we adopt a three-part test rooted in eminent principles of workers' compensation law. In this case, we conclude that material facts remain in dispute as to whether Mr. Frederick's home qualified as a home work site and whether he had commenced his work day and was fulfilling his work duties, or something incident thereto, at the time of his injury. Because it was for the jury to resolve these predicate factual issues, the circuit court erred in ruling, as a matter of law, that Mr. Frederick's injury arose out of and in the course of employment. Accordingly, we remand for a new trial.

## BACKGROUND

### A. The Petitioner's Case

Mr. Frederick was the only witness to testify at his trial in the circuit court. He explained that he was employed with Schwan for about four years[4] and described his job duties as a customer service representative:

> I would travel [] from store to store, meet with decision[] making personnel in the store, store managers, department managers, decide display aspects, like the end caps in the store where [] they have stuff at the end of the aisles

---

[4] Mr. Frederick testified that he is no longer employed with Schwan.

3

. . . on display, decide sales, [ascertain the] space[s] they were going to give me in the shelves. Decide, you know, quantity and inventory that the store may have wanted. Also helping replenish[] the shelves [] to make sure the shelves stayed full for customers to come in and purchase product.

According to Mr. Frederick, he could not have held his position as a customer service representative without having his own car to travel to each of his accounts.[5] Schwan reimbursed him for mileage incurred while traveling between his first and last accounts through a "fuel card that was pre-loaded at the beginning of each week" with funds to cover his travel expenses. Mr. Frederick admitted that Schwan did not normally reimburse him for mileage he incurred driving to his first account—although he did claim this mileage for tax purposes.

### The "Home Office"

Mr. Frederick testified that his office was at his home in Mount Washington where he had a computer and printer set up on his dining room table for work. Although Schwan did not pay for the computer, printer, or internet at his house, Mr. Frederick did receive an employee discount on his internet service pursuant to an agreement between the internet service provider and Schwan. Mr. Frederick asserted that Schwan was aware that he received this discount. Schwan also provided him with the Intermac—a small handheld computer that he used to complete work-related tasks. The Intermac required a WiFi connection, so he would use his Intermac at home where he had WiFi to complete his daily downloads and uploads of sales information. Mr. Frederick used the Intermac to enter his

---

[5] For the sake of consistency, we shall refer to individual grocery stores as separate "accounts."

reimbursable mileage for each day as well. He conceded that he could run the downloads on his Intermac after he left his home so long as he could connect to WiFi; however, he was unsure whether the Walmart in Ellicott City, or any of his accounts, had WiFi.

Additionally, Schwan mailed certain work materials, such as big display posters and coupons for grocery stores, to Mr. Frederick's home about "once or twice a week." He kept all of these work materials at his home because there was nowhere else he could keep them; he was prohibited from storing the materials at the grocery stores, and many of the materials were "too large to even store in [his] car and still be able to use [his] car on a daily basis."

### Mr. Frederick's Typical Work day

At trial Mr. Frederick described his typical work day around the time of his accident. He did not have set working hours; however, his typical work day began in the morning at his home "as soon as the phone started ringing really." He stated, "[p]eople would start calling you at [] 4 a.m. because that's when they were there and . . . available." Mr. Frederick related that his daily routine back in January 2016

> . . . would start in the morning. . . . Before I left my home I would do my download in my hand held. That kind of gave me an idea of what stores you had to go to that day. Gave me an idea of where the truck drivers were going to be going because we did not deliver our own product.
>      We had to coordinate with truck drivers in the morning before we went out [in order] to figure out [] which other customer service route stores [the drivers] had on hand . . . so we knew where we were going and as to where the truck was going so you weren't kind of running around trying to chase a delivery truck.

Mr. Frederick would then use the information from the downloads to contact the driver and other customer service representatives who had deliveries on that same truck to determine

the order of the deliveries. He would complete these communications from his home before leaving to drive to his first account.

When asked what other "work activities" he conducted at his home, Mr. Frederick replied:

> [F]rom home, my day would actually start much earlier as a lot of the department managers [who work during] the receiving hours [at] grocery stores [work] overnight . . . so there were a lot of times where . . . you made contact with these people before you left your home [] to decide if they were going to give you display space, or, if they were going to give you that, you had to coordinate that with them before they left the store in case you didn't make it to the store in time[.]

Once these preliminary communications were completed, Mr. Frederick would leave his home and travel from store to store using his personal vehicle to carry out his other work duties. He would typically hold business meetings with Schwan employees in grocery store parking lots or, for "large meetings where everyone was to be involved," Schwan would rent out a room in a public library or hotel.

## The Morning of the Accident

On January 28, 2016, Mr. Frederick related that the weather was "crappy" and that Maryland had just experienced one of the biggest snow storms in a long time. He testified:

> That day started, I don't remember exactly what time. I got up, I did my download. I get in contact with my driver[] to kind of figure out where he was going to be. Because of inclement weather the drivers tend to start a little bit later to give the road some time to get cleared up so they're not driving the big trucks out on the roads with icy conditions.
>     I had been in contact with my drivers. I ha[d] done some e-mails. That's . . . about it that morning.

He left his home around 9:00 a.m. to go to his first account, the Walmart in Ellicott City. Mr. Frederick testified that he had his work materials in his hands and his five-year-old son

walking beside him, "[o]ff to the left somewhere." He explained that he planned to drop off his son at daycare on his way to the Walmart.[6]

Mr. Frederick explained that dropping off his son at daycare was not his primary objective when he left the house, and that if he were not going to work, his son would not have been going to daycare. The daycare was a "block and a half" off-route from his house to the Walmart.

Ultimately, Mr. Frederick "never made it to the car." He fell on black ice that was on the walkway to his car outside of his house and suffered a fracture to his right leg, which, the record reflects, required open reduction internal fixation and a subsequent surgery.

### B. Motion for Judgment

At the close of Mr. Frederick's case, Schwan moved for a motion for judgment. Schwan argued that "it's clearly uncontradicted that [Mr. Frederick] was on his way to his son's daycare at the time that this injury occurred[.]" When the trial judge asked why this made a difference, Schwan pressed that Mr. Frederick's intent to drive his child to daycare established that Mr. Frederick was not in the course of his employment at that time. Further, Schwan continued, even if the court were to find that he was in the course of his employment, Mr. Frederick "deviated once he left the threshold of his house and continued to his son's daycare and any injuries during that trip . . . don't arise out of and in the course of his employment[.]" Schwan had to concede that obviously, regardless of whether Mr. Frederick had to take his child to daycare, it anticipated Mr. Frederick would be walking

---

[6] Mr. Frederick noted there was no specific time by which his son needed to be at the daycare.

out to his car to go to his first account that morning. Schwan clarified, however, that it was not arguing that the "going and coming rule" precluded Mr. Frederick's recovery of benefits.

Counsel for Mr. Frederick responded that the injury occurred "during a time and place where [Schwan] would expect him to be" because his workday began in his home when he completed his downloads and spoke with his drivers. Counsel argued that the injury was also compensable under the dual-purpose doctrine because "the daycare is two-thirds of the way to where his first stop is, you can't argue that . . . two-thirds of the trip is not providing a benefit to the employer."

After hearing Schwan's rebuttal, the trial judge denied Schwan's motion for judgment. Following a brief recess, Schwan rested its case and both parties moved for judgment. The court, again, denied Schwan's motion for judgment but granted Mr. Frederick's motion for judgment as a matter of law, ruling that his injury arose out of and in the course of his employment. The court explained:

> In this case here the employer effectively requires the employee to be where the accident occurred because it did not have an office in Maryland making it necessary for the employee to establish an office of some type to perform work for his employer.
>
> * * *
>
> Although Mr. Frederick did testify that he was going to make a stop at his child's daycare, he did have to leave his home office to [] go get to a customer's location. And this was [] not only a location where the employee may be working for the employer, [] effectively it happened at the place where he was working for the employer because he had established a presence at his home office. And also going to the customer's location is not only consistent with his work, it is essential based on the nature of Mr. Frederick's job that he provided testimony regarding.

The trial judge also ruled, in the alternative,

8

that the exceptions to the going and coming rule, that . . . at least two of them apply – that the employee's mode of transportation was required by the employer and that the employee was injured during a trip that served both a personal and business purpose.

The court entered an order on August 2, 2017, reversing the decision of the WCC and remanding the matter for entry of an order stating that Mr. Frederick sustained an accidental injury arising out of and in the course of employment. Schwan thereafter filed its timely appeal to this Court on August 17, 2017.

## I.

## STANDARD OF REVIEW

In this appeal, we examine whether the circuit court erred in granting judgment in favor of Mr. Frederick and ruling, as a matter of law, that his injury arose out of and in the course of his employment. In determining whether the circuit court properly granted judgment in this case, we consider the idiosyncratic procedure for "appeals" to the circuit court from decisions of the WCC. *See Baltimore Cty. v. Kelly*, 391 Md. 64, 74 (2006). The Court of Appeals in *Kelly* summarized the methods of appeal available to a party aggrieved by a decision of the WCC:

> A party dissatisfied by the action of the Commission may seek review in a circuit court by either proceeding on the record made before the Commission (much like judicial review of the final action of most state administrative agencies) or receive a new evidentiary hearing and decision before a jury (much like an original civil complaint brought in a circuit court).

*Id*. at 67. The latter method of appeal, found in Maryland Code (1991, 2016 Repl. Vol.), Labor and Employment Article ("LE"), § 9-745(d), affords "an 'essentially' *de novo* trial." *Id*. at 74. Under either method of appeal, however, "the decision of the Commission is

presumed to be prima facie correct" and "the party challenging the decision has the burden of proof." LE § 9-745(b). Therefore, "a different calculus emerges" with regard to the burden of production before the circuit court depending on whether the employer or the claimant chooses to appeal the decision of the WCC. When, like the instant case, the employer prevails before the Commission, and the claimant elects an appeal under what is essentially a *de novo* trial pursuant to § 9-745(d), the parties retain their initial burdens of proof and persuasion. *Kelly*, 391 Md. at 75. However, when, unlike in this case, the employer appeals a decision of the Commission in favor of the claimant and elects a jury trial under § 9-745(d), "the burden of proof, which was borne by the claimant before the Commission, switches to the employer before the circuit court." *Id.* "The decision of the Commission is, *ipso facto*, the claimant's *prima facie* case." *Id.* (internal citations omitted). The burden before the trier of fact in the circuit court is "upon the appellant to overcome the presumption that the decision of the Commission is prima facie correct," which is why the proceeding is qualified as an "essentially *de novo* trial." *Id*. at 76 (internal quotations omitted).

In an appeal from a circuit court's ruling on a motion for judgment, we conduct "the same analysis that a trial court should make when considering the motion for judgment." *D.C. v. Singleton*, 425 Md. 398, 406-07 (2012) (citation omitted). In doing so, we consider "the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Beall v. Holloway-Johnson*, 446 Md. 48, 63 (2016) (citation omitted) (quoting *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 393 (2011)). The circuit court may grant a motion for judgment when "the evidence is not such

10

as to generate a jury question, *i.e.*, permits but one conclusion[.]" *Address v. Millstone*, 208 Md. App. 62, 80 (2012) (citation omitted).   More specifically, in the context of a worker's compensation case, we follow the general principle that:

> [t]he question as to whether an injury arose out of or in the course of employment is ordinarily, like negligence or want of probable cause, a mixed question of law and fact, but when the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court.

*Harrison v. Cent. Constr. Corp.*, 135 Md. 170, 878 (1919); *Atlantic Refining Co. v. Forrester*, 180 Md. 517, 527-29 (1942).  Accordingly, "if there is *any* evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration." *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 698 (2017) (emphasis added) (internal quotation marks omitted).[7]  In sum, "[w]e review the trial court's grant of [the] [m]otion for [j]udgment *de novo*, considering the evidence and reasonable inferences drawn from the evidence in the light most favorable" to the employer in this case, *Gales v. Sunoco Inc.,* 440 Md. 358, 363 (2014) (internal quotations omitted), and we will remand if we determine that the evidence generated a question for the jury, *Marrick Homes LLC*, 232 Md. App. at 698.

## II.

### DISCUSSION

Schwan's primary contention on appeal is that Mr. Frederick's injury did not, as a

---

[7] In *Marrick Homes LLC*, this Court recognized that "[w]e review the grant of a motion for judgment under the same standard as we review grants of motions for judgment notwithstanding the verdict." 232 Md. App. at 697 (citation omitted).

matter of law, occur in the course of his employment. First, Schwan argues that Mr. Frederick did not commence his work day at his home and that he was "not performing or discharging any actual duty related to his employment" at the time of the injury because he left his home with the intent to take his son to daycare before traveling to his first account. According to Schwan, Mr. Frederick's application of the law "to a salesperson who offices from home . . . creates a time and space conundrum, in which [Schwan] is deemed liable for any potential injuries [Mr. Frederick] may endure, despite having no definitive awareness of where [Mr. Frederick] is or what activities he is participating in prior to arrival at the first [account]." Schwan characterizes Mr. Frederick's anticipated travel as a personal deviation, arguing that the fact that Mr. Frederick left his home with the intent to "eventually" go to a work-related site did not bring the trip within the scope of his employment. For this same reason, Schwan asserts that the dual-purpose doctrine does not apply to bring the injury within the course of employment. And, Schwan contends, because Mr. Frederick was not *in the course* of his employment, his injury also did not *arise out of* his employment and fails the positional-risk test.

Mr. Frederick responds that he "was injured during a time frame and in a location that his employer could expect him to be in the performance of his job duties." Specifically, he avers that his work day commenced when he conducted some work activities at his home because it was his "base of work operations." Moreover, he claims his work day extended through the time of the injury because he left his home with the purpose of carrying out his work obligation to arrive at his first account. Mr. Frederick further argues that although the purpose of his travel was work-related, even if the travel served some

12

personal purpose because it was "convenient" to take his son to daycare, his injury would still be compensable under the dual-purpose doctrine. Regarding the positional-risk test, Mr. Frederick maintains that his injury was compensable because, but for his work obligation to travel to his first account, he would not have been in the location where he was injured.

This case involves a constellation of factual determinations in the analysis of whether Mr. Frederick's injury occurred "in the course of" his employment. Namely, whether, under the terms and conditions of his employment and the totality of the circumstances, Mr. Frederick's home was a place where he could reasonably have been in the performance of his work duties and whether he had commenced his work day and was fulfilling his work duties, or something incident thereto, at the time he left to go to his first account. First, we review the applicable legal framework.

## A. The Maryland Workers' Compensation Act

Over a century ago, the Maryland Workers' Compensation Act ("the Act") became law. 1914 Md. Laws, ch. 800. Today the Act is codified at LE §§ 9-101 through 9-1201,[8] and instructs that "[t]his title shall be construed to carry out its general purpose." LE § 9-102(a).[9] The Court of Appeals has interpreted the Act's purpose to be "to protect workers

---

[8] During the 1991 legislative session, the General Assembly introduced H.B. 1, ch. 8, Laws of 1991, for the purpose of adding the "Labor and Employment Article" to the Code of Maryland and repealing and recodifying, *inter alia*, the laws of Maryland pertaining to workers' compensation. Specifically, H.B. 1 repealed and recodified Article 101 as Title 9 of the Labor and Employment Article.

[9] The stated purpose of the Act in 1914 was to "promote the general welfare of this State by providing compulsory insurance against accident or death of workmen engaged in

and their families through compensation for a loss of earning capacity due to workers' injuries that arise out of and in the course of employment." *Calvo v. Montgomery Cty.*, 459 Md. 315, 324 (2018) (citation omitted). The Act is remedial in nature and, therefore, "is to be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes as remedial social legislation."[10] *Id.* (quoting *Alitalia Linee Aeree Italiane v. Tornillo*, 329 Md. 40, 48 (1993)).

Under the Act, "each employer of a covered employee shall provide compensation in accordance with this title to[] the covered employee for an accidental personal injury sustained by the covered employee[.]" LE § 9-501(a). An "accidental personal injury" is defined as one which "arises out of and in the course of employment[.]" LE § 9-101(b)(1).[11]

---

extra-hazardous employments in this State, and providing for the form, kind and method of such insurance and the incidents thereto[.]" 1914 Md. Laws, ch. 800, Preamble.

[10] Section 9-102(b) clarifies that: "The rule that a statute in derogation of the common law is to be strictly construed does not apply to this title." LE § 9-102(b). *See Montgomery Cty. v. Robinson*, 435 Md. 62, 83 (2013) (explaining that because "we have repeatedly emphasized the Act's remedial nature and that it 'should be construed as liberally in favor of the injured employees as its provisions will permit in order to effectuate its benevolent purposes[,]' we, therefore, 'do not apply the canon of construction that a statute in derogation of the common law should be strictly construed.'").

[11] The long-standing requirements for establishing an "accidental personal injury" have remained substantively unchanged since the Act's inception in 1914. The Court of Appeals, in reviewing the legislative bill file on H.B. 1 and H.B. 692 (the companion bill to H.B. 1), has explained that the goal of the Act's recodification was "to rewrite the law in a more clear and concise manner without making any substantive changes. . . . Thus, while the language of a revision differs from the derivative statute, the legislative intent does not change." *Belcher v. T. Rowe Price Found., Inc.*, 329 Md. 709, 743 (1993) (internal quotations omitted).

Since 1992, there have been no amendments to LE § 9-501, and § 9-101 has been amended only twice without any substantive change to the "arising out of and in the course of" requirements for purposes of sustaining a compensable accidental personal injury. The 2009 amendments focused primarily on the total amount of death benefits payable to

Thus, "[t]he statute requires that the claimant satisfy two conditions precedent to bring a claim within the ambit of the Act—both 'arises out of' *and* 'in the course of' employment must be proven." *Livering v. Richardson's Restaurant*, 374 Md. 566, 574 (2003) (emphasis added) (citations omitted). Whether an injury arises out of and in the course of employment is informed by the "facts and circumstances of each individual case." *Id.*

### 1. "Arises out of employment"

The "arises out of" prong of the statute "refers to the causal connection between the employment and the injury." *Id.* at 574 (citing *Montgomery Cty. v. Wade*, 345 Md. 1, 9-10 (1997)); s*ee also Montgomery Cty. v. Smith*, 144 Md. App. 548, 556 (2002) ("Arising out of employment 'refers to the cause or origin of the accident.'") (citation omitted). An injury "arises out of" employment "'when there is a causal connection between the employment and the injury such that the injury 'results from some obligation, condition, or incident of employment.'" *Prince George's Cty. v. Proctor*, 228 Md. App. 579, 588 (2016) (quoting *Livering*, 374 Md. at 574). The Court of Appeals has instructed that "[t]he term 'arises out of' requires, not that the performance of an employment-related task be the direct or physical cause of the injury, but, more broadly, that the injury be incidental to the employment, such that it was by reason of the employment that the employee was exposed to the risk resulting in the injury." *Mulready v. Univ. Research Corp.*, 360 Md. 51, 57

partially dependent individuals. S.B. 863, ch. 616, Laws of 2009. During the most recent session, the General Assembly passed S.B. 94, ch. 5, Laws of 2019, thereby amending the name of the Consumer Price Index used to calculate compensation awards for permanent total disability benefits. On March 27, 2019, the bill was enacted into law under Article II, § 17(b) of the Maryland Constitution, and will go into effect on July 1, 2019.

(2000) (citation omitted).

The Court of Appeals in *Mulready* first adopted the test currently used to determine "arising out of" causation: the positional-risk test. *Id.* at 59. The test originally sought to determine "arising out of" causation in cases involving traveling employees. The Court pronounced the positional-risk test as:

> Absent facts indicating a distinct departure by the employee on a personal errand that would not be in the contemplation of the parties, an injury to a traveling employee generally is compensable so long as it occurred as a result of an activity reasonably incidental to the travel that the employer required.

*Id.* at 66.

Several years later, in *Livering*, the Court of Appeals considered whether an accidental injury suffered by an employee on her day off, but while checking her work schedule at her place of employment, was compensable under the Act. 374 Md. at 571. In reaching its decision, the Court refined the positional-risk test to focus the inquiry on whether the injury would have been sustained "but for" the fact that the conditions and obligations of employment placed the employee where the injury occurred. *Id.* at 575 (citation omitted). The Court determined that a necessary component of Ms. Livering's employment was to check her schedule, and that her employer knew that she and other employees visited the restaurant to check their schedules and acquiesced in the custom. *Id.* at 580. Therefore, "[c]hecking her scheduling was [] incident to her employment." *Id.* Moreover, because she was injured while checking her schedule, the Court further concluded that Ms. Livering "would not have been injured but for the fact that she visited the restaurant to confirm her schedule." *Id.* Consequently, the positional-risk test is now

16

applied in circumstances not only involving an employee on work-related overnight travel, but also in situations "where an employee is injured while engaging in activities incidental to employment." *Roberts v. Montgomery Cty.*, 436 Md. 591, 605 (2014).

## 2. "In the course of employment"

Distinct from the "arising out of" requirement,[12] the "in the course of" requirement of LE § 9-101(b)(1) considers the "the time, place, and circumstances of the accident in relation to the employment." *Wade*, 345 Md. at 11. As Professor Arthur Larson has explained, the "[i]n the course of" employment requirement "tests work-connection as to time, place and activity[.]" 2 Arthur Larson, et al., *Larson's Workers' Compensation Law* §12 at 12-1 (Matthew Bender rev. ed. 2018). Assessing whether an injury occurred in the course of employment is a fact-specific inquiry. *State v. Okafor*, 225 Md. App. 279, 286 (2015) (citation omitted). Stated succinctly, "[a]n injury is in the course of employment when it occurs during the period of employment at a place where the employee reasonably may be in performance of his or her duties and while fulfilling those duties or engaged in something incident thereto." *Wade*, 345 Md. at 11 (citations omitted). The Court of Appeals's explanation in *Wade* enumerates three integral components of an "in the course of" analysis:

> An analysis of the occupational correlation of these factors "demands that the injury be shown to have arisen within *the time and space boundaries* of the employment, and *in the course of an activity whose purpose is related to the employment*." Questions pertinent to this inquiry are: 1) when the

---

[12] We observe from the collection of published opinions on point that the facts relevant to these two distinct statutory requirements often overlap. *See Livering* 374 Md. at 580 ("Because many of the facts relevant to analyzing 'arising out of' and 'in the course of' overlap in this particular case, we shall consider the two tests together.")

employment began and ended, 2) whether the continuity of the period was broken, and 3) how far the employee placed himself or herself outside the employment during that period. . . . If the injury occurred at a point where the employee was within the range of dangers associated with the employment, it is held compensable under the Act.

*Id*. at 11-12 (citations omitted) (emphasis added).  It has also been established, however, that the phrase "in the course of employment" is not limited to "the actual manipulation of the tools of the work, nor to the exact hours of work." *Wade*, 345 Md. at 12 n.6 (citation omitted).

The going and coming rule commands that injuries are not considered to have occurred in the course of employment if sustained while an employee is going to or from his or her place of work. *Calvo*, 459 Md. at 329 (citations omitted); *Roberts*, 436 Md. at 606; *Garrity v. Injured Workers' Ins. Fund*, 203 Md. App. 285, 293 (2012) (citations omitted).  "With its genesis in the practical need of drawing a 'line' delineating an employee's 'scope of employment,'" *Santa Rosa Junior College v. Workers' Comp. Appeals Bd.*, 708 P.2d 673, 677 (Cal. 1985), the going and coming rule addresses the time and space boundaries of the employment.  *Cf. Reisinger-Siehler Co. v. Perry*, 165 Md. 191, 52 (1933) ("While service *on regular hours at a stated place generally begins at that place*, there is always room for agreement by which the service may be taken to begin earlier or elsewhere." (emphasis added)).  The underlying rationale for the rule is that "employees are responsible for ensuring their presence at work, and during the commute, they generally face the same hazards as other commuters.  Thus, the risks are not usually 'directly attributable to a person's particular employment.'"  *Calvo*, 459 Md. at 329 (citations omitted).  Such injuries, therefore, are not usually compensable unless they fall within one

18

of the recognized exceptions to the going and coming rule. *Okafor*, 225 Md. App. at 287.

## B. Time, Place, and Activity

As we noted earlier, Schwan attacks the circuit court's ruling chiefly under the "in the course of employment" prong of LE § 9-101(b)(1). "An injury is in the course of employment when it occurs during the period of employment at a place where the employee reasonably may be in performance of his or her duties and while fulfilling those duties or engaged in something incident thereto." *Wade*, 345 Md. at 11 (citations omitted).

### 1. Place

#### a. General Principles

We begin with the "place" component of the "in the course of" prong. The parties in this case dispute whether Mr. Frederick's home was a work site. The Act does not define "work site" or "place of employment," and we have found no reported decisions in Maryland that address the issue squarely within the context of injuries sustained by home-based employees or home office workers. We glean certain principles from both Maryland and out-of-state cases, however, that guide our analysis of whether the home can be recognized as a work site under Maryland's workers' compensation law.

As a starting point, we recognize Professor Larson's admonition that, "[t]eachers, doctors, lawyers, architects, artists, executives—*in fact almost any employee*—may have frequent occasion to perform services of some kind at home[.]" Larson § 16.10 at 16-27 (emphasis added); *see also Bobinis v. State Ins. Fund*, 235 A.D.2d 955, 956 (N.Y. App. Div. 1997) (warning courts to be cautious in determining when an employee's home has become part of the employer's premises "[a]s it is commonplace for many professional and

19

managerial level employees to take work home").

Maryland cases that apply the "going and coming" rule have established that an employee may not claim that work done at home for the employee's own personal convenience transforms the personal nature of a "going and coming" trip into a business trip. *See Stoskin v. Bd. of Educ. of Montgomery Cty.*, 11 Md. App. 355, 358 (1971) (employee who reviewed work materials at home and was injured the next morning on a public street upon arriving at her place of work could not rely on the work done at home to recover under the dual-purpose exception to the going and coming rule); *see also Fairchild Space Co. v. Baroffio*, 77 Md. App. 494, 498 (1989) (employee who chose to prepare a presentation at home and was injured the next morning in a car accident while going to her place of work could not rely on the work done at home to recover under the dual-purpose exception).

The resounding rationale offered in these cases is that where there is no evidence as to the nature of the employment agreement with respect to off-premises work, the courts are unwilling to hold that an employee's unilateral decision to select an off-premises place in which to do work furthers the employer's interests. *See Stoskin*, 11 Md. App. at 359 ("There is *no evidence showing any agreement, either express or implied*, between [employee] and her employer that [employee] was undertaking, outside of her regular place of employment, a special assignment for her employer's benefit[.]" (emphasis added)); *see also Fairchild*, 77 Md. App. at 499 ("Because there is *no evidence that [employer] required [employee] to perform the work at home*, the 'dual purpose' exception to the 'coming and going' rule is inapplicable." (emphasis added)).

Other important precepts that we draw from our decisional law include that an analysis of whether a home can be deemed a work site must take a totality of the circumstances approach, and that the fact finder must determine the issue according to the "facts and circumstances of each individual case." *Livering,* 374 Md. at 574. As the Court of Appeals has instructed, "[t]he word 'employment,' as used in [the] Act, includes not only the actual physical labor but *the whole period of time or sphere of activities*." *Saylor v. Black & Decker Mfg. Co.*, 258 Md. 605, 610 (1970) (quoting *Watson v. Grimm*, 200 Md. 461, 466 (1952) (emphasis added)). As such, a determination as to the "zone of protection" provided by the Act is one that must be "made in each case on its particular facts." *Id.*; *see also Okafor*, 225 Md. App. at 286 (explaining that in analyzing whether an injury occurred in the course of employment, "the *entire sphere and period of employment* may be considered and also whether the employee has placed himself outside his employment, and if so, how far. This is a fact-specific inquiry.") (internal quotations omitted) (emphasis added)).

### b. Larson's Indicia of a Home Work Site

With the aforementioned principles in mind, we find persuasive Professor Larson's approach to determining when a home qualifies as a place of employment:

> When reliance is placed upon the status of the home as a place of employment generally, instead of or in addition to the existence of a specific work assignment at the end of the particular homeward trip, three principal indicia may be looked for*: [1] the quantity and regularity of work performed at home; [2] the continuing presence of work equipment at home; and [3] special circumstances of the particular employment that make it necessary and not merely personally convenient to work at home.*

21

2 Larson § 16.10[2] at 16-24 (emphasis added).[13]  Like most other jurisdictions that have

analyzed the question of when the home becomes a work site, we will look to Larson's

"three principal indicia."  2 Larson § 16.10[2] at 16-24; *see, e.g.*, *Kaycee Coal Co. v. Short*,

450 S.W.2d 262, 265 (Ky. Ct. App. 1970) (finding, without expressly citing, Larson's three

"indicia of genuine home employment premises status" to be present under the facts of the

case); *Bobinis*, 235 A.D.2d at 956 (concluding that the employee's home did not achieve

the status of a work site under Larson's framework); *Kahn v. State*, 289 N.W. 2d 737, 743

(Minn. 1980) (determining that injuries sustained while en route from another work site to

the home was compensable because the home qualified as a work site under Larson's test);

*Wilson v. Serv. Broads. Inc*, 483 So.2d 1339, 1342 (Miss. 1986) (applying Larson's test to

determine whether employee's home constituted a place of work for purposes of

determining whether the employee's injury was compensable as an exception to the going

and coming rule); *Manzo v. Amalgamated Industries Union Local 76B*, 575 A.2d 903, 906-

---

[13] Maryland courts have consistently quoted, with approval, Professor Larson's discussions on various workers' compensation issues.  *See, e.g.*, *McElroy Truck Lines, Inc. v. Pohopek*, 375 Md. 575, 593 (2003) (quoting, with approval, Larson's treatise in introducing a comparative test for trucking and other transitory types of employment); *see also Mulready*, 360 Md. at 55 (quoting, with approval, Larson's treatise in adopting the positional-risk test); *Mackin v. Harris*, 342 Md. 1, 7-10 (1996) (adopting a narrower version of a test enunciated in Larson's treatise for purposes of determining when a subsequent injury is compensable under the Act); *Alitalia Linee Aeree Italiane*, 329 Md. at 46-47 (adopting Larson's own conveyance exception to the going and coming rule); *Darby v. Marley Cooling Tower Co.*, 190 Md. App. 736, 744-45 (2010) (finding Larson's discussion on standing instructive on this Court's interpretation of Maryland's rule on standing to appeal WCC decisions); *Barnett v. Sara Lee Corp.*, 97 Md. App. 140, 149 (1993) (finding Larson's discussion of fringe benefits to be "persuasive" in interpreting the meaning of a term in the Act); *Fairchild Space Co.*, 77 Md. App. at 498-99 (turning to Larson's rendition of the dual-purpose exception).

08 (N.J. Super. Ct. App. Div. 1990) (applying Larson's test to determine whether employee's home constituted a work place for purposes of rendering an injury sustained during travel from the home in New Jersey to the employer's office in New York compensable); *Hille v. Gerald Records*, 242 N.E.2d 816, 819 (N.Y. 1968) (finding that the employee's home had achieved the "status of a place of employment" under Larson's three indicia for purposes of applying the dual-purpose exception); *see Black River Dairy Prods., Inc. v. Dep't of Industry, Labor & Human Relations*, 207 N.W.2d 65, 69 (Wisc. 1973) (applying Larson's test to conclude that the employee's home constituted a work site and that he was, therefore, already at work at the time of the injury).

The Wisconsin Supreme Court in *Black River* addressed, *inter alia*, "whether the evidence [wa]s sufficient to sustain the finding that the workmen's compensation claimant, who was injured in a fall going from his home to his delivery truck, was performing services incidental to his employment[.]" 207 N.W.2d. at 66. Black River Dairy Products ("Black River") employed Donald Smith as a salesman for one of its products, Roma Pizza. *Id*. In his role as a salesman, Mr. Smith promoted, sold, and delivered Roma Pizzas to various customers. *Id*. Mr. Smith made his deliveries with an employer-provided delivery truck. *Id*. Mr. Smith did not have fixed working hours and used his own discretion in determining the amount of hours he worked per day. *Id*. His "practice," however, was to leave his home around 7 a.m. so that he could arrive at his first customer by 8 a.m., and then to work an average of 10 to 14 hours per day. *Id*. Because the company's office was almost 200 miles away from Green Bay, where Mr. Smith lived, Black River did not require him to report to the office. *Id*. Mr. Smith, instead, conducted his bookwork and business

23

calls from his home. *Id.* He also received a weekly stipend of $20 for payment of "electricity, phone calls, and promotion expenses." *Id.* Black River had about 40 other employees working the same position as Mr. Smith and "they all operated the same way." *Id.*

On the night before the accident, Mr. Smith prepared for the next day's route in his "customary manner"; he loaded up his delivery truck with pizzas and parked the truck in his driveway, which allowed him to plug the truck's electrical cord into his home and activate the truck's freezer unit to keep the pizzas frozen for the next day. *Id.* The next morning, Mr. Smith left his home through a back door, intending to get into his delivery truck to drive to his first customer of the day. *Id.* at 66-67. Unknown to Mr. Smith, there was an invisible sheet of ice on the sidewalk and driveway to his home. *Id.* at 67. He slipped and fell while walking to his truck and suffered a back injury. *Id.*

Reversing the trial court's decision, the Wisconsin Supreme Court held that Mr. Smith's injury arose out of and in the course of his employment.[14] *Id.* at 69. The Court

---

[14] On the basis of the Wisconsin workers' compensation statute, the Court determined that the case could be analyzed by applying either (1) the "traveling salesman" rule or (2) an exception to the "going and coming" rule. *Id.* at 67, 68-69. The Court began with Wisconsin's traveling-salesman exception. *Id.* at 68. This exception provided that, when an employee's job is to travel on behalf of an employer and to do work away from the employer's premises, the employment begins as soon as the employee leaves his or her home to go to the first work-related site. *Id.* at 68. Applying this exception, the Court observed that Mr. Smith's duty as a salesman required travel on behalf of the company and work away from the company's premises "by traveling within a prescribed route promoting business." *Id.* Furthermore, he was injured while acting in a customary manner—walking to his truck with the intent to go to his first stop and to perform his duty as a salesman. *Id.* Accordingly, the Court concluded that his injury fell within the scope of his employment because Mr. Smith's workday began as soon as he left his home and he was performing work for the benefit of his employer at the time of the injury. *Id.*

24

looked to Professor Arthur Larson's "three principal indicia" in order to determine whether Mr. Smith's home could be deemed the premises of the employer for purposes of falling under the exception to the going and coming rule under Wisconsin's workers' compensation statute. *Id*. at 69. Employing Larson's framework, the Court observed that Mr. Smith returned home every day to complete work-related tasks and also kept the employer-provided delivery truck at his home because it required an electrical connection to keep the employer's products frozen. *Id*. The "only reasonable inference," the Court observed, was that Mr. Smith did not work at home for his personal convenience, "but because the employer furnished him no other place to do this work." *Id*. Moreover, Black River's practice of giving Mr. Smith a weekly stipend to pay for certain home-related expenses demonstrated its awareness and approval of Mr. Smith's practice of using his home as a place of employment. *Id*. The Court concluded that Mr. Smith's home "should be deemed the premises of his employer" and, therefore, Mr. Smith was already at work at the time of the injury. *Id*.

By contrast, New Jersey's intermediate appellate court in *Manzo* applied Larson's three principal indicia and concluded that the employee's home did not qualify as a work site. 575 A.2d at 907-08. Mr. Manzo was the president of Industrial Union Local 76B ("the Union"). *Id*. at 904. At the time of his death, Mr. Manzo was driving a car, leased by the

---

Alternatively, the Court analyzed the case under Wisconsin's statutory exception to the going and coming rule. *Id*. The statute established that the premises of an employer, for purposes of sustaining compensable injuries while going to or from work, encompassed "the premises of any other person on whose premises service is being performed." *Id*. at 69.

Union, from his home in New Jersey to the Union's office in New York City when he was struck and killed by another automobile. *Id.* Mr. Manzo's wife subsequently filed a claim for dependency benefits with the Workers' Compensation Court, which ultimately awarded benefits and concluded that the "going and coming rule" did not preclude compensation. *Id.*

The workers' compensation judge found that Mr. Manzo's home had become a "job site" because he regularly used his home to conduct union business and that on the morning of his death, Mr. Manzo was performing union business. *Id.* at 904-06. Specifically, the judge found that (1) Mr. Manzo's office was located in New York City where his secretary and all appropriate office equipment were located; (2) the Union had an office in New Jersey which contained other appropriate office equipment; (3) Mr. Manzo, in his role as the president, often conducted union business from his home and kept all business records, as well as a phone for which the Union paid, at his home; and (4) Mr. Manzo had done some union work at home before leaving for his New York office on the day of the accident. *Id.* at 905. Based on these findings of fact, the judge concluded that Mr. Manzo's trip occurred while "he was going from one job site to another and thus arose out of and in the course of his employment." *Id.* The New Jersey intermediate appellate court disagreed.

In addressing the compensation judge's conclusion that Mr. Manzo's home had become a job site, the court narrowed its analysis to whether "it [was] necessary for Mr. Manzo to use his home for the conduct of union business or [whether] it [was] simply for his personal convenience[.]" *Id.* at 907. The court applied Larson's framework and prior appellate decisions in and outside of New Jersey, and rejected the compensation

26

judge's conclusion that "Mr. Manzo's work related activities at home were for the benefit of the Union, as opposed to his own convenience, [a]s not supported by the evidence" because the Union had provided offices in both New York and New Jersey containing business equipment. *Id*. at 907. Therefore, the Court disagreed with the conclusion that Mr. Manzo was traveling from one job site to another as "there [wa]s no dispute that, at the time of the accident preceding Mr. Manzo's death, he was on his way from his home to his office in New York City." *Id*. at 908.

Principles contained in Maryland law require an enhancement to Larson's third prong. In evaluating whether special circumstances of the employment rendered it necessary, and not merely personally convenient, for the employee to work at home (the third prong), there must also be evidence that the employer acquiesced to the employee regularly using his or her home as a work site, or reasonably should have known the employee was regularly using the home as a work site. The Court of Appeals's analysis in *Livering* is instructive.

As previously discussed *supra* Part.A.1., the employee in *Livering* was injured on her day off while checking her work schedule at her place of employment. 374 Md. at 571. Central to its determination that checking her work schedule at the restaurant was a task incident to her employment was the Court's recognition that although "[t]he employer neither required nor prohibited employees from visiting the establishment to check the schedule, [] it *knew about and acquiesced* in the custom." *Id*. at 580 (emphasis added). "Moreover, by unexpectedly changing the work schedule, the employer impliedly required employees constantly to be aware of it." *Id*. Consequently, the Court held that because

27

Ms. Livering's injury "occurred on the employer's premises while performing and as a result of, a task incident to her employment," her injury arose out of and in the course of employment. *Id.* at 580.

The Court of Appeals more recently in *Roberts* looked again to whether the employer acquiesced to the firefighter's activities at a certain fire station in that case. 436 Md. at 597-98. At the time of Mr. Roberts's injury, he was on "light duty" and was traveling from physical training at a nearby high school, which his employer encouraged, to his regular duty station to pick up his mail. *Id.* at 597-98. The Court concluded that the regular duty station was a work-related site to which Mr. Roberts was traveling at the time of his injury "because the mail he was picking up was that left for him at the site and the practice of gathering the mail was one about which his supervisors were aware. As a result, *the County 'acquiesced' in Mr. Roberts's act of gathering the mail at Fire Station 19.*" *Id.* at 606-07 (citing *Livering*, 374 Md. at 580) (emphasis added). Given this determination, together with the County's concession that the physical training rendered the high school a work-related site, the Court held that Mr. Roberts's travel was incidental to his employment and, therefore, the injury he sustained was covered by the Act. *Id.* at 607.

We observe that other jurisdictions that have adopted Larson's framework have spoken to the requirement that the employer know about or acquiesced to an employee regularly using his or her home as work site. *See, e.g.*, *Black River Dairy Prods.*, 207 N.W.2d at 69 (concluding that, in addition to the presence of Larson's three indicia, the employer's practice of giving the employee a weekly stipend for certain home-related expenses demonstrated its awareness of the employee's practice of using his home as a

28

work site); *cf. Bobinis*, 235 A.2d at 956-57 (holding that an employee's home did not achieve the status of a work site under Larson's framework and that "[f]urther, [the] claimant's supervisor testified that he encouraged his employees to perform their work, other than hearings, in the office as much as possible").

In sum, we hold that whether an employee's home qualifies as a work site under Maryland workers' compensation law is established by three indicia: (1) the quantity and regularity of work performed at home; (2) the presence of work equipment at home; and (3) the special circumstances of the employment rendering it necessary, and not merely personally convenient, to work at home. 2 Larson § 16.10[2] at 16-24. Under the last (third) prong, the fact-finder should also consider whether the employer acquiesced to the employee's use of his or her home as a work site, or reasonably should have known the employee was regularly using the home as a work site. *Cf. Roberts*, 436 Md. at 606-07; *Livering*, 374 Md. at 580.

## 2. Time

Even where the home qualifies as a work site, additional factual determinations must be made to satisfy the "time" component of the "in the course of" prong.[15] For example, even assuming Mr. Frederick's home qualified as a work site for his job, he must also have commenced his work day at the time he left to go to his first account in order to bring his injuries within "the period of [his] employment." *Wade*, 345 Md. at 11.

---

[15] We do not undertake an analysis of the "arising out of" prong of LE § 9-101(b)(1), pursuant to which the fact-finder would consider whether the injury would have been sustained "but for" the fact that the conditions and obligations of employment placed the employee where the injury occurred. *Livering*, 374 Md. at 575.

In *Proctor*, we considered the "pertinent question of when the employment began and ended" in assessing whether an injury that an employee sustained while leaving his home was compensable under the Act. 228 Md. App. at 591 (internal quotations omitted). Proctor, a Prince George's County police detective, was injured "when he jumped to the side to avoid knocking over his two-year old son as he and his family were walking out the front door of their home." *Id*. at 582. Det. Proctor had been on vacation the week preceding the injury and was not scheduled to return to work until two days after the date of the injury. *Id*. at 583. When the injury occurred, Det. Proctor was off-duty and was leaving his home to go pick up his police cruiser from the County's automotive repair facility. *Id*. at 583-84. The WCC denied Det. Proctor benefits, prompting him to petition for judicial review in the circuit court. *Id*. 585. Before the circuit court, "the parties agreed that there was no dispute as to the facts of the case and resolved to determine the legal issue through cross-motions for summary judgment." *Id*. After a hearing, the circuit court reversed the WCC's decision, ruling that Det. Proctor's actions arose out of and in the course of his employment at the time of the injury. *Id*. at 586.

Prince George's County, the employer, appealed to this Court, arguing that Det. Proctor's injury was not compensable because he was neither engaged in any law enforcement activity nor under any directive to retrieve his cruiser at the time of the injury. *Id*. at 587. In the alternative, the County posited that the "going and coming" rule precluded recovery. *Id*. Ultimately, we held that Det. Proctor's injuries did not arise out of or in the course of his employment. *Id*. at 591. In reaching our holding, we explained:

Although "course of employment" is not strictly limited to the actual labor or to

30

the precise hours of work, it is "generally taken for granted that workers' compensation was not intended to protect against all the perils of th[e] journey" between home and work. Injury to a worker that occurs before that journey has begun falls outside the course of employment.

*Id.* at 589 (internal citations omitted) (emphasis in original). We derived this principle from the Court of Appeals's decision in *Police Commissioner of Baltimore City v. King*, 219 Md. 127 (1959). In *King*, the Court of Appeals considered whether the beneficiaries of a deceased Baltimore City police officer were entitled to death benefits from various funds. *Id.* at 129. On the date of the accident, the officer in *King* had been at his home watching television with his son and then went upstairs to get ready to report for duty. *Id.* at 130. After about five minutes, the officer started down the stairway while partially dressed and "carrying his shirt, tie, cap, keys, claw and gun." *Id.* The officer slipped as he descended the stairway, accidentally discharging his service revolver and fatally wounding himself. *Id.*

The relevant statute for an award of death benefits under the fund at issue—the Special Fund—required that the officer have been injured "while in the actual performance of duty" and "while in the actual discharge of duty" in order to recover benefits. *Id.* at 132-33. The Court in *King* construed the scope of the phrase "in the actual performance of duty" by analogizing it to the terms "out of and in the course of employment" under Maryland workers' compensation law. *Id.* at 134-35. The Court then explained:

> We have consistently recognized the general rule that injuries sustained by employees while going to or returning from their regular place of work do not "arise out of and in the course of their employment," but in this case we are requested to hold that one who is dressing himself prior to starting on his trip to work is "in the actual performance of duty" or "in the discharge of duty." We think this would extend the rule entirely too far.

*Id.* at 135 (footnote omitted). The Court also acknowledged that, although the police department required the officers to "to hold themselves in readiness for emergency duty," the officer must nevertheless be actually discharging his regular duty or emergency duty at the time of the injury. *Id.* at 134-35. This led the Court to conclude, "As Patrolman King was off-duty and not performing or discharging any actual police duty at the time of his unfortunate accident, we must hold that he was not in the actual performance or discharge of duty." *Id.* at 136.

Returning again to *Proctor*, we observed, in light of *King* that at the time of his injury, Det. Proctor had been on vacation and was not expected to return to work for another two days; he was injured on his front porch while leaving his home; and, although he was preparing to make his journey to retrieve his cruiser, he had not yet embarked on this journey and was not subject to any directive to retrieve the cruiser. *Proctor*, 228 Md. App. at 590-91. Given these circumstances, we held that Det. Proctor's injuries did not occur in the course of his employment:

> Here, as in *King*, Det. Proctor was "off-duty and not performing or discharging an actual police duty at the time of his unfortunate accident[.]" *Looking to the pertinent question of "when the employment began and ended," we cannot say that Det. Proctor's injury occurred "within the time and space boundaries of the employment."* Rather, [Det. Proctor's] injury occurred on his own front porch, *while he was not on duty*, and while he was "not performing or discharging any actual police duty at the time of his unfortunate accident." We disagree that a fall on Det. Proctor's own front porch was "within the range of dangers associated with [his] employment." Accordingly, we agree with the WCC's determination that Det. Proctor's injury "did not arise out of and in the course of employment as alleged[.]"

*Id.* at 591 (internal citations omitted) (emphasis added). We also concluded that the going

32

and coming rule was not what barred Det. Proctor's recovery because his injuries "arose before he embarked on any work-related journey." *Id*. at 591-92. Therefore, we declined to analyze whether any exception to that rule applied to Det. Proctor's case. *Id*. at 592.

### 3. Activity

Finally, the third component of the "in the course of" prong requires that the injury also occur "while fulfilling those [work] duties or engaged in something incident thereto." *Wade*, 345 Md. at 11 (citations omitted). In the case in which a home qualifies as a work site, and an employee has commenced his or her work day before leaving home to travel to another work-related site, the Court of Appeals's decision in *Roberts* explains when the travel between the two work sites may be incidental to employment.

Thaddus Roberts was a paid firefighter employed by Montgomery County ("the County"). 436 Md. at 594. Mr. Roberts was working a "light duty" position at the Fire Department's main headquarters as a result of a prior work injury. *Id*. at 596. While on light duty, Mr. Roberts "worked four [10] hour shifts per week, starting at 7 a.m. and ending at 5 p.m." and was encouraged by the Fire Department to engage in two hours of physical training per shift at any location of his choice. *Id*. Additionally, Mr. Roberts would go to Fire Station 19, his "regular duty" station, about once per month to pick up work mail. *Id*. On the date of the accident, Mr. Roberts was driving from his physical training at a high school to Fire Station 19 to gather his mail when he was involved in a car accident. *Id*. at 597-98.

The WCC denied Mr. Roberts benefits, ruling that he did not sustain an accidental injury arising out of and in the course of his employment. *Id*. at 599. Mr. Roberts

petitioned for judicial review in the circuit court. *Id.* The County moved for summary judgment, arguing that Mr. Roberts's injury was barred by the going and coming rule. *Id.* at 599-600. In response, Mr. Roberts countered that "he was in a place he could reasonably be expected to be in going from one 'work-related duty' of physical training, to another, checking his work mail, which was 'acquiesced to by Mr. Roberts's supervisors,'" and that "but for" these work-related duties, he would not have been injured. *Id.* at 600. The circuit court nevertheless granted the County's cross-motion for summary judgment and affirmed the WCC's decision because the injury occurred while "he was coming and going" to work. *Id.* at 600-01 (internal quotations omitted). This Court, in an unreported opinion, affirmed the trial court's ruling and reasoned that Mr. Roberts was only "at work" when he was at the employer's headquarters, thus Mr. Roberts was only going to work at the time of his injury. *Id.* at 601.

The Court of Appeals granted certiorari to address whether the going and coming rule or the positional-risk test applied to determine whether Mr. Roberts's injury arose out of and in the course of his employment.[16] *Id.* at 606. The County conceded that the physical training was a work-related activity and that "any injury sustained during physical training" at the high school would have been compensable, but argued that Mr. Roberts was "not at his work site" until he reached the headquarters. *Id.* The Court rejected the County's argument and determined that Fire Station 19 was a work-related site because

---

[16] As discussed, the going and coming rule takes injuries outside of the course of employment and, as a result, bars compensation. Therefore, if the going and coming rule applies, there is no need to also apply the positional-risk test to determine causation. *Cf. Roberts*, 436 Md. at 607 n.15.

"the mail he was picking up was that left for him at the site and the practice of gathering the mail was one about which his supervisors were aware. As a result, the County 'acquiesced' in Mr. Roberts's act of gathering the mail at Fire Station 19." *Id.* at 606-07 (emphasis added). Based on this determination, the Court held that Mr. Roberts's injury arose out of and in the course of his employment:

> Mr. Roberts, thus, was *en route from a work-related activity to a site where he was to engage in a work-related act, to which the employer acquiesced. His travel, therefore, was incidental to his employment.* Travel incidental to employment *cannot be excluded from coverage by application of the going and coming rule.* As a result, the injury he sustained is covered by the Workers' Compensation Act, because "but for" his travel between work-related sites he would not have been injured.

*Id.* at 607-08 (emphasis added) (footnote omitted). The Court noted further that cases exploring the exceptions to the going and coming rule were inapplicable because the going and coming rule did not apply. *Id.* at 607 n.15.

To be sure, even if an employee sustains an injury during a compensable journey, a deviation during such a trip could, depending on the circumstances, take an injury outside the scope of employment. *See Rumple v. Henry H. Meyer Co.*, 208 Md. 350, 358 (1955) ("There is no exact method of determining the legal effect of a deviation. It depends upon the circumstances; the nature of the work and the terms of the contract of employment being most important.").

### C. Analysis

Applying all of the foregoing principles to the case before us, we cannot say that the evidence permitted "but one conclusion" with regard to whether Mr. Frederick's injury occurred in the course of his employment. *Millstone*, 208 Md. App. at 80. Though this

35

inquiry can be a pure question of law in a case in which the parties stipulate that "there is no dispute as to the inferences to be drawn from the facts," *Calvo*, 459 Md. at 326, that was not the case here. The parties dispute all the factual points discussed above.

Looking to the *place* component of the "in the course of" prong, material facts remained in dispute in this case relating to all of the indicia for determining whether the home qualified as a work site. Mr. Frederick testified that he routinely conducted work-related tasks from his home in the mornings before leaving for his first account, including the daily downloads on the Intermac and phone communications with his accounts and the truck drivers on his daily route. He also testified, however, that one-on-one business meetings with other Schwan employees were typically held in grocery store parking lots and that larger meetings were held in a rented public library or hotel.

With regard to the work equipment in his home, Mr. Frederick admitted that Schwan did not provide either the computer or the printer that he set up on his dining room table. Besides the coupons and big display posters that Schwan mailed to Mr. Frederick's home, there was no evidence of any other work equipment in the home. The parties dispute whether the discounted internet service that Schwan provided Mr. Frederick was specifically to further his work-related activities at home.

The parties heavily dispute whether Mr. Frederick's performance of work-related activities at home was engendered by mere personal convenience or necessity. The record establishes that Schwan did not provide any local offices from which he could work. Mr. Frederick testified that, therefore, he had to conduct his daily downloads and send his reimbursable mileage entries on the Intermac at his home because the device required WiFi

36

connection. However, he also testified on cross-examination that he could run the downloads on his Intermac after he left his home so long as he could connect to WiFi. Based on this testimony, Schwan argues that "it was really out of his personal convenience that he used [the Intermac] at home in the morning." From this evidence, the jury could have concluded that Mr. Frederick's use of the Intermac at home to conduct his daily downloads was done for either personal convenience *or* necessity.

Significantly, the record does not establish whether or not Schwan acquiesced to Mr. Frederick using his home as a work site, or reasonably should have known of such use. For example, although Schwan did not provide any local office from which Mr. Frederick could work, *Black River Dairy Prods.,* 207 N.W.2d at 69, Mr. Frederick also admitted that Schwan typically rented space for large work-related meetings and did not reimburse him for mileage he incurred driving to his first accounts. Thus, at the motion for judgment stage, the evidence did not establish, as a matter of law, that Mr. Frederick's home met the criteria of a home work site.

The facts also permitted alternative inferences regarding the *time* component of the "in the course of" analysis. Schwan argued that Mr. Frederick was not at work until he arrived at his first account and that it was Schwan's understanding that the employment relationship began at his first account—the point at which he was eligible to receive reimbursement for his mileage. To the contrary, Mr. Frederick argued that his work day had begun at his home because that was "his office," and because he had already spoken to his drivers and conducted his daily downloads prior to leaving for his first account. Clearly, the question of whether Mr. Frederick had begun his work day before he left to

take his child to daycare was a question for the jury.

Finally, it was also for the jury to decide the *activity* component: whether Mr. Frederick's injury occurred "while fulfilling th[e] duties [of his employment] or engaged in something incident thereto." *Wade*, 345 Md. at 11. The trial court concluded that Mr. Frederick's injury occurred while "going to [his] customer's location" from his home office and that such a task was essential to his job.[17] The factual disputes regarding the time and space boundaries of Mr. Frederick's employment, however, affect whether his walk to his car (the activity) was incidental to his employment.

In a case in which an employee is injured leaving his or her home to go to work, the law typically bars recovery under the going and coming rule, unless one of its exceptions apply. *Calvo*, 459 Md. at 329 (citations omitted). *Proctor*, on which Schwan relies, applies in cases in which the home is not a work site and the injury occurs while performing an activity unrelated to employment and "*before* [a] journey [between the home and work] has begun[.]" 228 Md. App. at 589, 591. In cases in which the home is deemed a work site, an injury that occurs during travel between work-related sites, may be within the scope of employment. *Roberts*, 436 Md. at 607. However, if, for example, an employee deviates during the course of an otherwise work-related trip, then depending on the circumstances, the deviation may take the injury outside the course of employment. *Rumple*, *supra,* 208 Md. at 358. Each analysis is dependent on resolution of the predicate facts informing place, time, and activity, which, in this case, remain in dispute.

---

[17] The court viewed the injury, in the alternative, as occurring during a commute and, accordingly, found it compensable under the exceptions to the going and coming rule.

We hold that the trial court erred in concluding, as a matter of law, that Mr. Frederick's injury "occurred in the course of his employment." *See, e.g.*, *Scherr v. Miller*, 229 Md. 538, 544-45 (1962) (holding that the trial court properly denied the employer's motion for judgment because it was "possible for a jury to draw either of two incompatible inferences from the conflicting evidence" with respect to the issue of causation); *Harrison*, 135 Md. at 877-78 (reversing the trial court's grant of a motion for judgment because there were disputed facts and inferences as to whether the injury arose out of and in the course of employment).[18]

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**

---

[18] Similarly, in light of the unresolved factual disputes relating to the "in the course of" prong, we also cannot say, as a matter of law, that Mr. Frederick's injury arose out of his employment. As the Court of Appeals observed in *Livering*, "many of the facts relevant to analyzing 'arising out of' and 'in the course of' overlap" in some cases. 374 Md. at 580. That is also the case here. Unable to determine whether Mr. Frederick's home was a work place, whether his work day had commenced, and whether he was engaged in an activity incidental to employment at the time of his injury, we are simply unable to apply the positional-risk test to determine whether Mr. Frederick's injury would not have occurred but for the conditions and obligations of his employment. *See id.* at 575.